1 | Lockridge Grindal Nauen P.L.L.P.
Richard Lockridge (not admitted)

2 | Robert Shelquist (not admitted)
ralockridge@locklaw.com

3 | rkshelquist@locklaw.com
100 Washington Avenue South, Suite 2200

4 | Minneapolis, Minnesota 55401
Telephone: (612) 339-6900

5

6 | Law Office of Joseph H. Malley
Joseph H. Malley (not admitted)

7 | malleylaw@gmail.com
1045 North Zang Blvd

8 | Dallas, TX 75208
Telephone: (214) 943-6100

9 | William M. Audet (CA State Bar #117456)
waudet@audetlaw.com

10 | Michael McShane (CA State Bar #127944)
mmcshane@audetlaw.com

11 | Jonas P. Mann (CA State Bar #263314)
jmann@audetlaw.com

12 | AUDET & PARTNERS, LLP
221 Main Street, Suite 1460

13 | San Francisco CA 94105
Telephone: 415.568.2555

14 | Facsimile: 415.568.2556

15 | *Counsel for Plaintiffs*

**FILED**

FEB 15 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

16

17

18

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**PSG**

19 | **SAN JOSE DIVISION** **CV11**

**0 700**

20 | DANIEL RODIMER, ARFAT ADIL , EMILI CLAR, JEROD COUCH, BARBARA DAVIS, MATT HINES,

21 | DIEGO LOPEZ, AARON MULVEY, ANNA M. RUSTON, GENA TERRY; individuals, on behalf of

22 | themselves and others similarly situated,

Plaintiffs,

23 |

24 | v.

APPLE, INC., a California Corporation; FLURRY, INC.,

25 | a Delaware Corporation; MEDIALETS, INC., a Delaware Corporation; PINCH MEDIA INC., a

26 | Delaware Corporation; QUATTRO WIRELESS, INC., a Delaware Corporation; IAC/INTERACTIVECORP, a

27 | Delaware Corporation; GROUPON, INC., a Delaware Corporation; NPR, a Washington, DC., Corporation;

28 |

CASE No.

JURY DEMAND

**CLASS ACTION COMPLAINT FOR:**

1. Violations of Computer Fraud and Abuse Act, 18 U.S.C. §1030;

2. Violations of the Electronic Communications Privacy Act 18 U.S.C. §2510;

3. Violations of California's Computer Crime Law, Penal Code § 502;

Class Action Complaint

1

NEW YORK TIMES CO., a Delaware Corporation;
PANDORA MEDIA, INC., a Delaware Corporation;
WEBMD HEALTH SERVICES GROUP, INC, a
Delaware Corporation; YELP!, INC., a Delaware
Corporation; and Doe Corporations 1- 100 inclusive,

Defendants.

4.   Violations of the California
     Invasion of Privacy Act, Penal
     Code § 630;

5.   Violations of the Consumer Legal
     Remedies Act, ("CLRA")
     California Civil Code § 1750;

6.   Violation of Unfair Competition,
     California Business and Professions
     Code § 17200;

7.   Breach of Contract;

8.   Conversion;

9.   Trespass to Personal Property /
     Chattels; and

10.  Unjust Enrichment

Plaintiffs, Daniel Rodimer, Arfat Adil, Emili Clar, Jerod Couch, Barbara Davis, Matt Hines, Diego Lopez, Aaron Mulvey , Gena Terry, and Anna M. Ruston, on behalf of themselves and all others similarly situated, by and through their attorneys, Audet & Partners, LLP, Lockridge Grindal Nauen P.L.L.P., and Law Office of Joseph H. Malley, P.C., as and for their complaint, and demanding trial by jury, allege as follows upon information and belief, based upon, *inter alia*, investigation conducted by and through their attorneys, which are alleged upon knowledge, sue Defendants Apple, Inc., Flurry, Inc., Medialets, Inc., Pinch Media, Inc., Quattro Wireless, Inc., IAC/InterActiveCorp, Groupon, Inc., NPR, New York Times Co., Pandora Media, Inc., WebMD, LLC, and YELP!  Plaintiffs' allegations as to themselves and their own actions, as set forth herein are based upon their personal knowledge, and all other allegations are based upon information and belief pursuant to the investigations of counsel. Based upon such investigation, Plaintiffs believe that substantial evidentiary support exists for the allegations herein or that such allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

The true names and capacities, whether individual, corporate, associate or otherwise, of each of the Defendants designated as a DOE are unknown to Plaintiff at this time and therefore

1    Plaintiff sues Defendants by such fictitious names, pursuant to California Civil Code § 474.

2    Plaintiff will ask leave of the Court to amend this Complaint to show the true names and

3    capacities of the Doe Defendants when that information is ascertained. Plaintiff is informed and

4    believes, and thereon alleges that each of the Defendants designated herein as a DOE is legally

5    responsible in some manner, for the performance of the acts and omissions described below, and

6    is liable for the events and happenings alleged and, in such manner, proximately caused harm to

7    Plaintiff as further alleged.

8         Defendants, and the DOE Defendants, and each of them, are individually sued as

9    participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and

10   transactions that are the subject of this Complaint.

11                           **NATURE OF THE ACTION**

12        1.    Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of

13   Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) on behalf of themselves and a class of similarly

14   situated Internet users, each a "Class Member" of the putative "Class," as further described

15   herein, who were victims of privacy violations and unfair business practices; wherein their

16   privacy, financial interests, and security rights, were violated by the following Defendants:

17   Apple, Inc., (hereinafter referred to as "Apple"), Flurry, Inc., (hereinafter referred to as

18   "Flurry"), Medialets, Inc., (hereinafter referred to as "Medialets"), Pinch Media, Inc.,

19   (hereinafter referred to as "Pinch Media"), Quattro Wireless, Inc., (hereinafter referred to as

20   "QWAPI"), IAC/InterActiveCorp., (hereinafter referred to as "IAC"), Groupon, Inc., (hereinafter

21   referred to as "Groupon"), NPR, Inc., (hereinafter referred to as "NPR"),  New York Times Co.,

22   (hereinafter referred to as "New York Times"), Pandora Media, Inc., (hereinafter referred to as

23   "Pandora Media"), WebMD, LLC, (hereinafter referred to as "WebMD"), and Yelp! Inc.,

24   (hereinafter referred to as "Yelp"), affiliated individually, and in concert, to gain unauthorized

25   access to, and unauthorized use of, Plaintiffs' and Class Members' mobile devices, referencing

26   electronic devices used for communication over a cellular network and include internet and

27   multimedia capabilities, which include specifically: iPhone, iPad, and iPod Touch; hereinafter

28   referred to collectively as "mobile devices," in order to access, collect, monitor, and remotely

1   store, electronic data derived, in whole or part, from the mobile devices', which includes but is

2   not limited to Unique Device Identifiers; hereinafter referred to as "UDIDs."

3       2.      The nature of this action includes a sequence of events and consequences wherein

4   IAC/InterActiveCorp, Groupon, Inc., NPR, The New York Times Co., Pandora Media, Inc.,

5   WebMD, LLC, and Yelp! Inc., (hereinafter referred to collectively as "Application Developers")

6   and Pinch Media, Medialets, QWAPI, Flurry, (hereinafter referred to collectively as

7   "Application Developers Affiliates") gained individually, and in concert with Defendant Apple,

8   unauthorized access to, transmittal of, and use of data, which included but was not limited to, the

9   Plaintiffs' and Class Members' UDID, obtained from the Plaintiffs' and Class Members' mobile

10  devices, bypassing the technical and code based barriers intended to limit access, in addition to

11  bypassing the Plaintiffs' and Class Members' privacy and security settings. The Defendants

12  perpetuated this fraudulent activity knowingly, and with the intent to transmit and access data

13  obtained, in whole or part, by its use of the Plaintiffs' and Class Members' UDID for

14  unauthorized purposes, including but not limited to the Plaintiffs' and Class Members' mobile

15  browsing activities.

16      3.      Apple acted independently, and in concert with Application Developers and

17  Application Developer's Affiliates, each knowingly authorized, directed, ratified, approved,

18  acquiesced in, or participated in conduct, made the basis of this Class action, which included, but

19  was not limited to, the unauthorized access to, and unauthorized use of the Plaintiffs' and Class

20  Members' mobile devices.

21      4.      The Defendants' business plan involved unauthorized access to, and disclosure of,

22  Personal Information ("PI"), Personal Identifying Information ("PII"), Sensitive identifying

23  information ("SII"), hereinafter referred collectively to as User's Personal Information ("UPI"),

24  obtained from the Plaintiffs' and Class Members' mobile devices using their UDID, provided by

25  Defendant Apple, to aggregate all Plaintiffs and Class Member's data including but not limited

26  to, users' mobile device activities which Defendants accomplished covertly, without actual

27  notice, awareness, consent or choice of its users involving millions of consumers' mobile phones

28  circumventing Plaintiffs' and Class Members' privacy and security controls, for purposes not

1    disclosed within their Terms of Service and/or Privacy Policy, failing to protect Plaintiffs and

2    Class Members, involving their physical security, causing economic injury, obtained for

3    Defendants' commercial gain.

4                                    **JURISDICTION AND VENUE**

5         5.    Venue is proper in this District under 28 U.S.C. §1391(b) and (c) against

6    Defendants. A substantial portion of the events and conduct giving rise to the violations of law

7    complained of herein occurred in this District and Defendants' conduct business with consumers

8    in this District. Defendant Apple, Inc.'s principle executive offices and headquarters, during the

9    class period, were located in this District at 1 Infinite Loop, Cupertino, CA, 95014.

10        6.    This court has Federal question jurisdiction as the complaint alleges violation of

11   the following:

12             1)   Computer Fraud and Abuse Act, 18 U.S.C. §1030; and

13             2)   Electronic Communications Privacy Act 18 U.S.C. §2510

14        7.    Subject-matter jurisdiction exists in this Court related to this action pursuant to 28

15   U.S.C. § 1332. The aggregate claims of Plaintiffs and the proposed Class Members exceed the

16   sum or value of $5,000,000.00 exclusive of interests and costs.

17        8.    Venue is proper in this district and vests jurisdiction in the California state and

18   federal courts in the district of the location of their principal corporate place of businesses. Thus,

19   mandatory jurisdiction in this U.S. District Court vests for any Class Member, wherever they

20   reside, for the mobile device activity made the basis of this action which occurred within the

21   United States. The application of the law of the State of California should be applied to any

22   mobile device activity made the basis of this action anywhere, within the United States, as if any

23   and all activity occurred entirely in California and to California resident. Thus, citizens and

24   residents of all states are, for all purposes related to this instant Complaint, similarly situated

25   with respect to their rights and claims as California residents, and therefore are appropriately

26   included as members of the Class, regardless of their residency, or wherever the mobile device

27   activity occurred made the basis of this action.

28        9.    The following corporation is a California corporation headquartered in California,

1  during the class period, and Plaintiffs assert claims on behalf of a proposed class whose members

2  are scattered throughout the fifty states and the U.S. territories; there is minimal diversity of

3  citizenship between proposed Class Members and the Defendant, and the aggregate of these

4  claims exceed the sum or value of $5,000,000.00 exclusive of interests and costs:

5          a.     Apple, Inc.

6       10.    The following corporations are non-California corporations, headquartered in

7  California, during the class period, and Plaintiffs assert claims on behalf of a proposed class

8  whose members are scattered throughout the fifty states and the U.S. territories; there is minimal

9  diversity of citizenship between proposed Class Members and the Defendant, and the aggregate

10  of these claims exceed the sum or value of $5,000,000.00 exclusive of interests and costs:

11          a.     Flurry, Inc.

12          b.     Medialets, Inc.

13          c.     Pandora Media, Inc.

14          d.     Pinch Media, Inc.

15          e.     Quattro Wireless, Inc.

16          f.     YELP! Inc.

17       11.    The following corporations are non-California corporations, were not

18  headquartered in California during the class period, and Plaintiffs assert claims on behalf of a

19  proposed class whose members are scattered throughout the fifty states and the U.S. territories;

20  there is minimal diversity of citizenship between proposed Class Members and the Defendant,

21  and the aggregate of these claims exceed the sum or value of $5,000000.00 exclusive of interests

22  and costs:

23          a. WebMD, LLC

24          b. IAC/InterActiveCorp

25          c. Groupon, Inc.

26          d. NPR

27          e. The New York Times Co.

28       12.    This Court has personal jurisdiction over the Defendant Apple which maintained

1    its corporate headquarters in, and the acts alleged herein, were committed in California, within

2    this district, during the class period.

3        13.    Minimal diversity of citizenship exists in this action, providing jurisdiction as

4    proper in the Court, since Defendants are corporations headquartered in this District during the

5    class period, and Plaintiffs include citizens and residents of this District, and assert claims on

6    behalf of a proposed Class whose members are scattered throughout the fifty states and the U.S.

7    territories; thus there is minimal diversity of citizenship between proposed Class Members and

8    the Defendants.

9        14.    This is the judicial district wherein the basis of the conduct complained of herein

10   involving the Defendants was devised, developed, implemented.  The actual interaction of

11   information and data was activated from, and transmitted to and from this District; therefore all

12   evidence of conduct as alleged in this complaint is located in this judicial district.

13                                    **PARTIES**

14       15.    Plaintiff Daniel Rodimer ("Rodimer") is a citizen and resident of Clearwater,

15   Florida, (Pinellas County, Florida).

16       16.    Plaintiff Afat Adil ("Adil") is a citizen and resident of Los Angeles, California,

17   (Los Angeles County).

18       17.    Plaintiff Emili Clar ("Clar") is a citizen and resident of Dallas, Texas, (Dallas

19   County, Dallas, Texas)

20       18.    Plaintiff Jerod Couch ("Couch") is a citizen and resident of Ballinger, Texas,

21   (Runnels County, Ballinger, Texas).

22       19.    Plaintiff Barbara Davis ("Davis") is a citizen and resident of Dallas, Texas,

23   (Dallas County, Dallas, Texas).

24       20.    Plaintiff Matt Hines ("Hines") is a citizen and resident of Fort Worth, Texas,

25   (Tarrant County, Fort Worth, Texas).

26       21.    Plaintiff Diego Lopez ("Lopez") is a citizen and resident of San Jose, California,

27   (Santa Clara County, San Jose, California).

28       22.    Plaintiff Aaron Mulvey ("Mulvey") is a citizen and resident of Dallas, Texas,

1   (Dallas County, Dallas, Texas).

2       23.   Plaintiff Anna M. Ruston ("Ruston") is a citizen and resident of Dallas, Texas,

3   (Dallas County, Dallas, Texas).

4       24.   Plaintiff Gena Terry ("Terry") is a citizen and resident of Odessa, Texas, (Ector

5   County, Odessa, Texas).

6       25.   Defendant Apple, Inc., ("Apple") is a California corporation headquartered in

7   California, during the class period, a privately owned corporation, which maintained its

8   headquarters at 1 Infinite Loop, Cupertino, CA 95014. Defendant Apple, Inc., did business

9   throughout the United States, and in particular, did business in State of California and in this

10  judicial district.

11      26.   Defendant Flurry, Inc., ("Flurry") is a Delaware corporation headquartered in

12  California, during the class period, a privately owned corporation, which maintained its

13  headquarters at 282 2nd Street, Suite 202, San Francisco, CA 94105. Defendant Flurry, Inc., did

14  business throughout the United States, and in particular, did business in State of California and in

15  this judicial district.

16      27.   Defendant Medialets, Inc., ("Medialets") is a Delaware corporation headquartered

17  in New York, during the class period, a privately owned corporation, which maintained its

18  headquarters at 450 W. 15th Street, Suite 200, New York, NY 10011. Defendant Medialets, Inc.,

19  did business throughout the United States, and in particular, did business in State of California

20  and in this judicial district.

21      28.   Defendant Pinch Media, Inc., ("Pinch Media") is a Delaware corporation

22  headquartered in New Jersey, during the class period, a privately owned corporation, which

23  maintained its headquarters at 711 Adams St., Unit 5, Hoboken, NJ 07030. Defendant Pinch

24  Media, Inc., did business throughout the United States, and in particular, did business in State of

25  California and in this judicial district.

26      29.   Defendant Quattro Wireless, Inc., ("QWAPI") is a Delaware corporation

27  headquartered in Massachusetts, during the class period, a privately owned corporation, which

28  maintained its headquarters at 260 Charles Street, 4th Floor, Waltham, MA 02453. Defendant

1  Quattro Wireless, Inc., did business throughout the United States, and in particular, did business

2  in State of California and in this judicial district.

3      30.     Defendant IAC/InterActiveCorp, is a California Corporation with its principal

4  place of business in Oakland, California. Defendant is the maker of the iPhone App:

5  Dictionary.com

6      31.     Defendant, Groupon, Inc., is a Delaware Corporation with its principal place of

7  business at 600 W. Chicago Ave., Suite 620, Chicago, Illinois. Defendant Groupon, is the maker

8  of the iPhone App: Groupon.

9      32.     Defendant, NPR, is a Delaware Corporation with its principal place of business in

10  Washington, DC. Defendant, NPR, is the maker of the iPhone App: NPR.

11     33.     Defendant, The New York Times CO., is a Delaware Corporation with its

12  principal place of business in Manhattan, NY. Defendant, New York Times Co., is the maker of

13  the iPhone App: N Y Times.

14     34.     Defendant, Pandora Media, Inc., is a Delaware Corporation with its principal

15  place of business at 2101 Webster Street, Ste. 1650, Oakland, California 94612. Defendant,

16  Pandora, is the maker of the iPhone App: Pandora.

17     35.     Defendant, WebMD, LLC, is a Delaware Corporation with its principal place of

18  business at  111 Eighth Avenue 7th Floor New York, NY 10011. Defendant, WebMD, LLC, is

19  the maker of the iPhone App: Medscape.

20     36.     Defendant, YELP! Inc., is a Delaware Corporation with its principal place of

21  business in San Francisco, CA. Defendant, YELP!, is the maker of the iPhone App: YELP!.

22  **A.  <u>Plaintiff Daniel Rodimer's Experiences</u>**

23     37.     On information and belief, Plaintiff Daniel Rodimer's incorporates all allegations

24  within this complaint, and his experiences are the same to all Plaintiffs and Class Members.

25     38.     At all relevant times herein, Rodimer owned a mobile device, used that mobile

26  device, and on one or more occasions during the class period, in the city of residence, accessed

27  the Defendant Apple's iTunes Store to download iTunes applications.

28     39.     The downloaded iTunes Applications include, but are not limited to the following:

1    Messages, calendar, Photos, Camera, YouTube, Settings, Stocks, Maps, Weather, Compass,

2    lock, App Store, Tango, AOL Radio, Facebook, Ma…Mail, AZ_SB1070, Flashcards, Free WIFI,

3    Google Earth, iBooks, LawStock, Netflix, AllRecipes, BofA, Bible.

4         40.    On information and belief, one (1) or more of the Defendants Application

5    Developers Application downloaded by Rodimer, is affiliated with one (1) or more of the

6    Defendant Application Affiliates.

7         41.    As Rodimer accessed his applications, Defendant Apple then transmitted, and/or

8    allowed access to, without notice or authorization, his mobile device's UDID to the Defendant

9    Application Developers which then was transmitted to the Defendant Application Developers

10   Affiliates, acting in concert and individually, to access any and all available mobile device data

11   derived from Rodimer's mobile device.

12        42.    In January 2011, Rodimer became aware of information related to the tracking

13   activities of one (1) or more of iPhone applications he had downloaded. It is Rodimer's belief

14   that Defendant Apple's transmitting of, or allowing access to, his mobile devices' UDID

15   permitted one or more objects within his mobile device to be used for tracking by Defendant

16   Application Developers and Application Developers Affiliates, thus his mobile device data was

17   obtained in an effort to monitor and profile his Internet application activities. Rodimer did not

18   receive notice of the installation of such a tracking identifier, did not consent to the installation of

19   such a tracking identifier, and did not want such a tracking identifier to be installed on his mobile

20   device; moreover did not authorize Defendant Apple to transmit his UDID to iPhone

21   applications, nor the Defendants Application Developer's, nor the Defendants Application

22   Developers Affiliates without notice or his express consent.

23        43.    Rodimer observed that his mobile device tended to operate more slowly and

24   sometimes froze when loading web pages and that the actions of all Defendants used his

25   bandwidth without authority or compensation. Plaintiff Rodimer spent time for maintenance on

26   his mobile device, attempting to address this condition. Plaintiff Rodimer believes that, if he

27   were to visit the Apple iTunes Store and download applications, and/or open the Defendant

28   Application Developers Apps, the tracking device used by Defendants to access, collect, monitor,

1 | and remotely store his electronic data, including but not limited to, UDIDs that will be used

2 | again by the Defendants.

3 |     44.    Plaintiff Rodimer considers information about his mobile device activities to be in

4 | the nature of confidential, personal information that he protects from disclosure, including by

5 | controlling his browser settings for acceptance or rejection. Plaintiff Rodimer was not made

6 | aware by Defendant Apple that it would create a Unique Device Identifier and "sell" such to

7 | parties, without his knowledge or authorization.

8 | **B.  Plaintiff Arfat Adil's Experiences**

9 |     45.    On information and belief, Plaintiff Arfat Adil incorporates all allegations within

10 | this complaint, and his experiences are the same to all Plaintiffs and Class Members, including

11 | Plaintiff Daniel Rodimer's experience.

12 |     46.    At all relevant times herein, Adil owned a mobile device, used that mobile device,

13 | and on one or more occasions during the class period, in the city of residence, accessed the

14 | Defendant Apple's iTunes Store to download iTunes applications.

15 |     47.    The downloaded iTunes Application include, but are not limited to the following:

16 | Wells Fargo, Ringtones, Mover, Facebook, Words Free, Echofon, Pocket Tanks, FallingBalls

17 | Flashlight, Bump, Yelp, Fandango, Urbanspoon, Shazam, ESPN Streak, RunKeeper, imeem

18 | Pandora, Remote, Sportacular.

19 |     48.    On information and belief, one (1) or more of the Defendants Application

20 | Developers Application downloaded by Adil, is affiliated with one (1) or more of the Defendant

21 | Application Affiliates.

22 | **C.  Plaintiff Emili Clar's Experiences**

23 |     49.    On information and belief, Plaintiff Emili Clar incorporates all allegations within

24 | this complaint, and her experiences are the same to all Plaintiffs and Class Members, including

25 | Plaintiff Daniel Rodimer's experience.

26 |     50.    At all relevant times herein, Clar owned a mobile device, used that mobile device,

27 | and on one or more occasions during the class period, in the city of residence, accessed the

28 | Defendant Apple's iTunes Store to download iTunes applications.

51.    The downloaded iTunes Application include, but are not limited to the following: Currency, WallpapersHD, WallpapersHD, IMDb, Flixster, Netflix, Pandora, Shazam, Google, NYtimes, Evernote, TWC, Yelp, iBooks, Google Earth, RedLaser, Light, Dictation, AroundMe, Find iPhone, Wi-Fi Finder, Monopoly, Words, Jumping Dog, Sudoku2, Tetris, Scrabble, UNO, Angry Birds, EOW, Wordweb, Skype, Epicurious, American, BofA, myWireless, realtor.com, Amazon.com, eBay, seafood, facebook, perfect dogs, GasBuddy, Dog Parks.

52.    On information and belief, one (1) or more of the Defendants Application Developers Application downloaded by Clar, is affiliated with one (1) or more of the Defendant Application Affiliates.

**D.   Plaintiff Jerod Couch's Experiences**

53.    On information and belief, Plaintiff Jerod Couch incorporates all allegations within this complaint, and his experiences are the same to all Plaintiffs and Class Members, including Plaintiff Daniel Rodimer's experience.

54.    At all relevant times herein, Couch owned a mobile device, used that mobile device, and on one or more occasions during the class period, in the city of residence, accessed the Defendant Apple's iTunes Store to download iTunes applications.

55.    The downloaded iTunes Application include, but are not limited to the following: Facebook, Monopoly, Shazam, Last.fm, TWC, UPS, Wells Fargo, ScoreCenter, Pandora, Backgrounds, Scramble CE, Tango, GC, Angry Birds, sudoku2, Dog Whistler, Worldwide Ringtone, FOX news, BingMusic, Qik Video Pro, Microsoft Ex, ScoreCenter, NYTimes iMapMyRUN.

56.    On information and belief, one (1) or more of the Defendants Application Developers Application downloaded by Couch, is affiliated with one (1) or more of the Defendant Application Affiliates.

**E.   Plaintiff Barbara Davis' Experiences**

57.    On information and belief, Plaintiff Barbara Davis incorporates all allegations within this complaint, and her experiences are the same to all Plaintiffs and Class Members, including Plaintiff Daniel Rodimer's experience.

58. At all relevant times herein, Davis owned a mobile device, used that mobile device, and on one or more occasions during the class period, in the city of residence, accessed the Defendant Apple's iTunes Store to download iTunes applications.

59. The downloaded iTunes Application include, but are not limited to the following: Hey Taxi, iRec, IQ Test, Pulsar, National Debt, Public Radio, Medscape, Fixster, Percalculator, Snaptell, Whocited, formulas, My Wireless, your rights.

60. On information and belief, one (1) or more of the Defendants Application Developers Application downloaded by Davis, is affiliated with one (1) or more of the Defendant Application Affiliates.

**F. Plaintiff Matt Hines' Experiences**

61. On information and belief, Plaintiff Matt Hines incorporates all allegations within this complaint, and his experiences are the same to all Plaintiffs and Class Members, including Plaintiff Daniel Rodimer's experience.

62. At all relevant times herein, Hines owned a mobile device, used that mobile device, and on one or more occasions during the class period, in the city of residence, accessed the Defendant Apple's iTunes Store to download iTunes applications.

63. The downloaded iTunes Application include, but are not limited to the following: Facebook, linkedln, Twitter, Hulu Plus, DocsToGo, Installous, Messenger, Skype, eBay, Selling, DIRECTV, GV-iView, Air Horn, Backbreaker, DH: Safari, Dropbox, Gunclub2, How To Tie, Draw Slasher, BFHunting, Fish Tycoon, NYTimes, Dynamite Fishing, FOX news, 5-0 Radio Pro, iBooks, Map Quest, ResidentEvil4, SleepMachineLite, Tap Fish, TweetDeck, Tap Zoo Pandora, USPS mobile, Y! Messenger, WBAPAM, NPR Addict, NPR news, AccuWeather, Gangstar, CamViewer, Crash Kart, Doodle God, FileViewer USB, WinterBoard, Yelp, Atomic Web, Fruit Ninja, Draw Slasher, System, WorldView, Craigs + DFW, Recommends, A-List DFW, RxMindMe, WSJ, iBeer, Groupon, Skee-Ball, mviewer, VTT, Attack, Best of YouTube, Extreme, Mix Tube, Doodle Jump, Doodle Army, Fall Guy, Flick Fishing, Google Earth, Google, Night stand, Sleep Cycle, foursquare, monster, vtiger.

64. On information and belief, one (1) or more of the Defendants Application

1    Developers Application downloaded by Hines, is affiliated with one (1) or more of the Defendant

2    Application Affiliates.

3    **G. Plaintiff Diego Lopez's Experiences**

4         65.    On information and belief, Plaintiff Diego Lopez incorporates all allegations

5    within this complaint, and his experiences are the same to all Plaintiffs and Class Members,

6    including Plaintiff Daniel Rodimer's experience.

7         66.    At all relevant times herein, Lopez owned a mobile device, used that mobile

8    device, and on one or more occasions during the class period, in the city of residence, accessed

9    the Defendant Apple's iTunes Store to download iTunes applications.

10        67.    The downloaded iTunes Application include, but are not limited to the following:

11   Imeem, Justin .tv, iheartradio, AOL radio, Shazam, Pandora, 3PtLite, DinerDashLite, Labyrinth

12   LE, PaperFootball, Vegas Lite, Sudoku, DoodleJump, iFighterLite, BClassicLite, iBowl,

13   BeerPong, Sharpshooter, Apartments, Urbanspoon, Flashlight, eBay, Chase, Smartvocab, iCall,

14   Aim, textPlus, Trapster, Bump, Facebook, Whacksy Taxi, Kik, Spin Bottle, Paper Toss.

15        68.    On information and belief, one (1) or more of the Defendants Application

16   Developers Application downloaded by Lopez, is affiliated with one (1) or more of the

17   Defendant Application Affiliates.

18   **H. Aaron Mulvey's Experiences**

19        69.    On information and belief, Plaintiff Aaron Mulvey incorporates all allegations

20   within this complaint, and his experiences are the same to all Plaintiffs and Class Members,

21   including Plaintiff Daniel Rodimer's experience.

22        70.    At all relevant times herein, Mulvey owned a mobile device, used that mobile

23   device, and on one or more occasions during the class period, in the city of residence, accessed

24   the Defendant Apple's iTunes Store to download iTunes applications.

25        71.    The downloaded iTunes Application include, but are not limited to the following:

26   Skype, Google, IAC/InterActiveCorp, Pandora, Y! Messenger, Southwest, Compass, Patents,

27   Settings, Bump.

28        72.    On information and belief, one (1) or more of the Defendant Application

1    Developers Application downloaded by Mulvey, is affiliated with one (1) or more of the

2    Defendant Application Affiliates.

3    **I.   Plaintiff Anna M. Ruston's Experiences**

4           73.    On information and belief, Plaintiff Anna M. Ruston incorporates all allegations

5    within this complaint, and her experiences are the same to all Plaintiffs and Class Members,

6    including Plaintiff Daniel Rodimer's experience.

7           74.    At all relevant times herein, Ruston owned a mobile device, used that mobile

8    device, and on one or more occasions during the class period, in the city of residence, accessed

9    the Defendant Apple's iTunes Store to download iTunes applications.

10          75.    The downloaded iTunes Application include, but are not limited to the following:

11   Compass, Google, HeyTell, TMZ, Justin.tv, Y! Messenger, Broadcaster, IMDb, iTranslate,

12   Pandora, AOL Radio, iheartradio, Shazam, Flixster, AroundMe, TalkingCarl, Find iPhone

13   TKL, SpillDamilk, Paper Toss, PapiJump, Papimissle, A Snake, Bowl Lite, Hungry..Ptl,

14   Game Center, Tv Quizzle, 4 in a row, Words Free.

15          76.    On information and belief, one (1) or more of the Defendants Application

16   Developers Application downloaded by Ruston, is affiliated with one (1) or more of the

17   Defendant Application Affiliates.

18   **J.   Plaintiff Gena Terry's Experiences**

19          77.    On information and belief, Plaintiff Gena Terry incorporates all allegations within

20   this complaint, and her experiences are the same to all Plaintiffs and Class Members, including

21   Plaintiff Daniel Rodimer's experience.

22          78.    At all relevant times herein, Terry owned a mobile device, used that mobile

23   device, and on one or more occasions during the class period, in the city of residence, accessed

24   the Defendant Apple's iTunes Store to download iTunes applications.

25          79.    The downloaded iTunes Application include, but are not limited to the following:

26   Lose it!, MySpace, PAC-MAN, Pandora, Scramble CE, Skee-ball, SleepMachine, Smash Fiesta,

27   Smurfs, ToDo+, TPRI2010, Tricky FREE, Trip Out, TWC, Waldo, Wallpapers,

28   IAC/InterActiveCorp, DreamBook, EZ-30!, EZ-30!, Fandango, FOX Sports, French LE, Game

of Life, Ghost Radar, Glow..Snake, Google Earth, Hangman, Horoscopes, iHoroscope, IMDb, LetsTans dlx, Facebook, Tango, UMK3, , FatBooth, AgingBooth, Million WPs, WallpaperHD, 55k Quotes, Alarm Clock, Angry Birds, Blue Block, Brain Trainer, College FB, Converter+, CryptoQuote, Wallpapers, Words Free, ToonCamera, PhotoStudio, CharMap, ColorSplash, Words, iP Free, HeyTell, Craigsphone, MyFoodCalc, VirtualMonkey.

80.     On information and belief, one (1) or more of the Defendants Application Developers Application downloaded by Terry, is affiliated with one (1) or more of the Defendant Application Affiliates.

**K.  Sequence of Events and Consequences- Plaintiffs and Class Members**

81.     The sequence of events, and consequences common to Plaintiffs and Class Members, made the basis of this action, include, but are not limited to the following:

a)     Plaintiffs and Class Members are individuals in the United States who own and use their Defendant Apple mobile devices, and accessed the Apple iTunes Store.

b)     Defendant application developers are approved by Defendant Apple as a "Developer" and entered into a licensing agreement with Defendant Apple to host a platform for iPhone user's access to iPhone applications.

c)     Defendant Application Developer's Affiliates are Ad Networks and/or Web Analytic Vendors that are affiliated with authorized Apple iTunes Application Developers, and entered into a licensing agreement with one (1) or more of the Defendant Application Developers.

d)     Plaintiffs and Class Members accessed the Defendant Apple iTunes Store, entered into a licensing agreement with one (1) or more of the Defendant Application Developers, installed iPhone applications associated with one (1) or more of the Defendant Application Developers, within the class period.

e)     Defendant Apple then transmitted, and/or allowed access to, without notice or authorization, the Plaintiffs' and Class Members' UDID, to one (1) or more of the Defendant Application Developers which in turn transmitted or allowed access of the UDID to its Defendant Application Developer Affiliate.

1    f)    Defendant Application Developers and its associated Defendant Application

2  Developer Affiliates then took unprecedented liberties, without notice, or authorizations, with

3  obtaining at will, any and all mobile device data of the plaintiffs and Class Member's mobile

4  devices, using the mobile device's UDID to aggregate the mobile device data.

5    g)    Defendant Application Developers Affiliates then created, individually and in

6  concert with Defendant Application Developers, a database related to Plaintiffs and Class

7  Member's mobile device data, which also revealed web browsing activities, to assist the

8  Defendants tracking scheme. Such tracking could not be detected, managed or deleted, and

9  provided, in whole or part, the collective mechanism to track Plaintiffs and Class Members,

10  without notice or consent.

11    h)    Defendant Application Developer's Affiliates and Defendant Application

12  Developers then conducted systematic and continuous surveillance of the Plaintiffs' and Class

13  Members' mobile devices activity, which continues to date.

14    i)    Defendant Application Developer's Affiliates and Defendant Application

15  Developers Affiliates then copied, used, and stored the mobile device UDID data derived from

16  the Plaintiffs' and Class Members' mobile devices, after it knowingly accessed, without

17  authorization, the Plaintiffs' and Class Members' mobile device.

18    j)    Defendant Application Developer's then obtained Plaintiffs' and Class Members'

19  UPI, derived, in whole or part, from its monitoring the mobile application activities of Plaintiffs

20  and Class Members. The personal information Defendants compiled, and misappropriated,

21  includes details about Plaintiffs' and Class Members' profiles to identify individual users to track

22  them on an ongoing basis, across numerous applications, and tracking users when they accessed

23  applications from different mobile devices, at home and at work. This sensitive information may

24  include such things as users' video application viewing choices to obtain personal characteristics

25  such as gender, age, race, number of children, education level, geographic location, and

26  household income, what the Plaintiffs and Class Members viewed and what he/she bought, the

27  materials he/she read, details about his/her financial situation, his/her sexual preference, and

28  even more specific information like health conditions.

1       k)      Defendant Application Developers then used Defendant Application Developers

2 analytics software to collect, use and disclose device data to a third parties, an act that violates

3 Plaintiffs' and Class Members' mobile device's agreement.

4       l)      Defendant Apple then provided assurances to Plaintiffs and Class Members that

5 any and all iPhone authorized applications had been "vetted" and were safe for downloading.

6       m)     Defendant Apple then failed to notify and warn Plaintiffs and Class Members of

7 its covert activities within their mobile devices, and the covert tracking activities of Defendants

8 Application Developers and Application Developers Affiliates before, during, and after notice, of

9 the unauthorized practices, made the basis of this action, so that Plaintiffs and Class Members

10 could take appropriate actions to opt-out of the unauthorized surveillance by Defendants, and/or

11 to delete any and all Defendant applications

12      n)     Defendant Apple then failed to block access to, and void the licensing agreements

13 of Defendant Application Developers after it received notice of individual and concerted actions,

14 made the basis of this action.

15      o)     Defendant Apple then failed to provide any terms of service, or privacy policy,

16 related to its use of UDIDs for tracking, or provide an updated privacy policy alerting it's users

17 of Defendant Application Developers and Defendant Application activity, made the bases of

18 these actions, thus Plaintiffs and Class Members had no notice of such activities, nor the ability

19 to mitigate their harm and damage after the fact.

20      p)     Defendant Apple Developers then failed to provide any terms of service, or

21 privacy policy, related to its use of UDIDs for tracking, or provide an updated privacy policy

22 alerting it's users of Defendant Application Developer's involvement and Defendants

23 Application's activity, made the bases of these actions, thus Plaintiffs and Class Members had no

24 notice of such activities, nor the ability to mitigate their harm and damage after the fact.

25      q)     Defendant Apple Developers Affiliates then failed to provide notice to Plaintiffs

26 and Class Members of its tracking activities in order to obtain authorization, thus Plaintiffs and

27 Class Members had no notice of such activities, nor the ability to mitigate their harm and damage

28 after the fact.

1       r)    Defendant Apple then did not provide Plaintiffs and Class Members information

2   within its privacy policies concerning the affiliation of each iPhone application developer, its

3   Application Developer's Affiliates, and information related to the extent of its tracking, made the

4   basis of this action, nor adequate opt-out information, resulting in the following:

5           1)    Plaintiffs and Class Members that desired to cease tracking by Defendants

6               by deleting the Defendants' application, had Defendant continue to track

7               their activities.

8           2)    Plaintiffs and Class Members that became aware of Defendants

9               association with each Defendant were unable to also delete their UDID

10              from within their own mobile device to cease all tracking.

11      s)    Plaintiffs and Class Members that became aware that Defendants had created a

12  database, and deleted the databases to cease any and all tracking, had the Defendants maintain

13  storage and use of all data derived from its unauthorized activity.

14      t)    Defendants then converted the Plaintiffs' and Class Members' electronic data,

15  including but not limited to UDIDs, for commercial gain.

16      u)    Plaintiffs' and Class Members' allegations, made the basis of this action, are

17  supported in whole or part by the following recent studies:

18          1.    Ashkan Soltani and David Campbell, Electric Alchemy.net, "The

19              Journal's Cellphone Testing Methodology," (last accessed January 25,

20              2011), online:

21              http://online.wsj.com/article/SB10001424052748704034804576025951767

22              7626460.html

23          2.    Eric Smith, "iPhone Applications & Privacy Issues: An Analysis of

24              Application Transmission of iPhone Unique Device Identifiers (UDIDs)"

25              (last accessed January 25, 2011), online: http://www.pskl.us/wp/wp-

26              content/uploads/2010/09/iPhone-Applications-Privacy-Issues.pdf; and

27          3.    William Enck, Peter Gilbert, Byung-Gon Chun, Landon P. Cox, Jaeyeon

28              Jung, Patrick McDaniel, Anmol N. Sheth, "TaintDroid: An Information-

1     Flow Tracking System for Realtime Privacy Monitoring on Smartphones"

2     (last accessed January 25, 2011), online:

3     http://www.appanalysis.org/tdroid10.pdf

4        4.    Manuel Egele, Christopher Kruegel, Engin Kirda, and Giovanni Vigna,

5     "PiOS:Detecting Privacy Leaks in iOS Applications," (last accessed

6     January 25, 2011), online:

7     http://www.technologyreview.com/computing/27128/?pl=A2&a=f

8     82.    Plaintiffs and Class Members involved with the Defendants were harmed by its

9  practices, including but not limited to the following:

10       a)    Violation of legally protected Federal, State and Common Law rights of

11             privacy.

12       b)    Incurring time and expense to remedy the effects of Defendants' actions to

13             their mobile devices.

14       c)    Time and expense to repair their mobile device to remediate the impaired

15             operability caused by the Defendants.

16       d)    Loss of property by the inability to re-sell Plaintiffs' and Class Members'

17             mobile devices due to UDID tracking mechanism link to users' browsing

18             data.

19       e)    Financial Harm by the Defendants' authorized use of Plaintiff and Class

20             Member's mobile device's Bandwidth used during the process of

21             Defendants obtaining mobile device data.

22     83.    The conduct of the Defendants, individually and jointly, is a fraud that has been

23  perpetrated for years, facilitated, and coordinated, by some of the world's largest application

24  developers, network advertising industry, and web analytic vendors, thereby costing the Class

25  upwards of tens of millions of dollars. Defendants has been systematically defrauding Class

26  Members in a covert operation of surveillance made possible by their gross misconduct,

27  negligence, apparent coordination, and actual fraud, and violating one (1) or more of the

28  following:

1      1) Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA");

2      2) Electronic Communications Privacy Act 18 U.S.C. §2510 (the "ECPA");

3      3) California's Computer Crime Law, Penal Code § 502;

4      4) California Invasion of Privacy Act, Penal Code § 630;

5      5) Consumer Legal Remedies Act, ("CLRA") California Civil Code § 1750;

6      6) Unfair Competition, California Business and Professions Code § 17200;

7      7) Breach of Contract;

8      8) Conversion;

9      9) Trespass to Personal Property / Chattels; and

10     10) Unjust Enrichment

11     84.    Defendants manipulated the Plaintiffs' and Class Members' mobile devices, which

12 have computing functions used in and affecting interstate commerce and communication and

13 were therefore protected computers, a conduct violation as defined in the Computer Fraud and

14 Abuse Act, Title 18, United States Code, Section 1030(e)(2).

15     85.    Defendants obtained Electronic Communications sent to the Plaintiffs' and Class

16 Members' mobile device from defendant Apple, including but not limited to, the Plaintiffs' and

17 Class Members' UDID, information sought to identify the Plaintiffs and Class Members, since

18 such persisted across Internet sessions. Such provided in whole, or part, the ability to identify the

19 user's mobile device's functions, a conduct violation of the Electronic Communications Privacy

20 Act 18 U.S.C. §2510.

21     86.    Defendants' conduct, made the basis of this action, included but was not limited

22 to, tampering, interference, unauthorized access to Plaintiffs' and Class Members' mobile device,

23 a conduct violation of the California's Computer Crime Law, California Penal Code § 502.

24     87.    Defendants' conduct, made the basis of this action, involved the unauthorized

25 access to Plaintiffs and Class Members Electronic Communications with one (1) or more entities

26 based in California, a conduct violation of the California Invasion of Privacy Act Penal Code §

27 630 et seq.

28     88.    Defendants' conduct, made the basis of this action, was an engagement in unfair

1  and deceptive acts and practices in the course of transactions with Plaintiffs and Class Members,

2  and such transaction were intended to and did result in the sale of services, a conduct violation of

3  the Consumer Legal Remedies Act, California Civil Code § 1750, et seq.

4      89.    Defendants' conduct, made the basis of this action, resulted in acts of deception,

5  fraud, inconsiderable and unfair commercial practices, concealing, suppressing, and/or omitting

6  material facts with the intent to have Plaintiffs and Class Members rely upon such concealment,

7  oppression on omission. Defendants' unfair and deceptive trade acts caused damage and harm to

8  Plaintiffs' and Class Members', a conduct violation of the Unfair Competition Law, California

9  Business and Professions Code § 17200.

10      90.    Defendant Apple's conduct, made the basis of this action, was a breach of contract

11  between Defendant Apple and Plaintiffs and Class Members, including but not limited to, failure

12  to abide by the licensing agreement which forbade release of personal information to third parties

13  without notice and express consent. Defendant Application Developers' contractual duties and

14  obligation to Defendant Apple do not release Defendant Apple from its liability to Plaintiffs and

15  Class Members.

16      91.    Defendant Application Developers' conduct, made the basis of this action, was a

17  breach of contract between Defendant Apple and Plaintiffs and Class Members, including but not

18  limited to, failure to abide by the licensing agreement which forbade release of personal

19  information to third parties without notice and express consent. Defendant Apple and Defendant

20  Application Developer Affiliates contractual duties and obligation to Defendant Application

21  Developers do not release Defendant Application Developer from its liability to Plaintiffs and

22  Class Members.

23      92.    Defendants' conduct, made the basis of this action, included acts of conversion

24  whereby the Plaintiffs' and Class Members' mobile device data, which included sensitive and

25  personal identifying information, was obtained by Defendants, exercising dominion over such

26  property, and providing to third parties for commercial gain:

27      •    Plaintiffs and Class Members own the right to possess the personal property,

28  including but not limited to, Plaintiffs' and Class Members' data, obtained by the Defendants.

1    Defendants' intentionally exercised dominion and control over such user data, deprived the

2    Plaintiffs and Class Members of such possession and use, and caused damages to the Plaintiffs

3    and Class Members.

4          •    Plaintiffs and Class Members sought to maintain the secrecy and confidentiality

5    of their personal information assets acquired by Defendants, which assets were Personal

6    Information ("PI"), Personal Identifying Information ("PII"), Sensitive identifying information

7    ("SII"), derived in whole or part from their Unique Device Identifiers ("UDIDs"), and/ or

8    Plaintiffs' and Class Members' Internet browsing activities.

9          •    The means by which Defendants obtained such information and the reasons

10   Defendant engaged in its business practices made the basis of this action, demonstrate the

11   confidential character of such information, users' efforts to protect it, and the economic value of

12   Plaintiffs' and Class Members' data. Defendants acts of conversion include but are not limited to

13   the following,

14         •    Defendants' conduct has caused economic loss to Plaintiffs and Class Members in

15   that, in a barter economy in which users' patronage (which is the subject of Defendants' traffic

16   measurement activities) is the currency with which users acquire ostensibly no-fee web services,

17   their patronage has independent economic value. In addition, inasmuch as Defendants'

18   wrongfully acquired Plaintiffs' and Class Members' patronage, Plaintiffs and Class Members

19   were deprived of the opportunity to contribute their patronage to web entities that did not engage

20   in such wrongful conduct,

21         •    Further, the Plaintiffs' and Class Members' electronic data, misappropriated by

22   Defendants, and populated with their actual user data constitute assets with discernable values.

23   Certainly given Defendants' conduct, Defendants associate economic value with the Plaintiffs

24   and Class Members UDID derived data. In addition, even have specific valuations in criminal

25   markets. For example, Symantec reported that, in 2007, the illicit market value of a valid

26   Hotmail or Yahoo cookie was three dollars,

27         •    The aggregated loss and damage sustained by Plaintiffs and Class Members,

28   individually and collectively, set forth above includes economic loss with an aggregated value of

1  at least $5,000 during a one-year period. Defendants perpetrated the acts and omissions set forth

2  in this complaint through an organized campaign of deployment, which constituted a single act.

3       93.    Defendants' conduct, made the basis of this action, resulted in an act of Trespass

4  to the Personal Property/ Chattel of the Plaintiffs and Class Members by obtaining user data and

5  a mobile device "Fingerprint," a practice of obtaining device information to perpetually identify

6  the mobile device. The Defendants' actions were surreptitious, without notice and so were

7  conducted without authorization and exceeding authorization. Defendants intentionally and

8  without consent, physically interfered with the use and enjoyment of personal property in the

9  Plaintiffs' possession, and the Plaintiffs and Class Members was thereby harmed. The

10  interference with the Plaintiffs' and Class Members' property/ chattel resulted in harm to their

11  interest in the physical condition, quality or value of the property/ chattel.

12       94.    Defendants' conduct, made the basis of this action, individual improperly and

13  illegally profiting from the obtainment and/or sale of Plaintiffs' and Class Members' sensitive

14  and personal identifying information, committed intentionally and without notice to Plaintiffs

15  and Class Members such conduct provided Defendants an Unjust Enrichment:

16                                  **PRIVACY DOCUMENTS**

17       95.    Defendant Apple does business online, using domains which include, but are not

18  limited to: http://www.apple.com/itunes/, and its business can be described as:

19                  "An American multinational corporation that designs and markets consumer

20                  electronics, computer software, and personal computers. The company's best-

21                  known hardware products include the Macintosh line of computers, the iPod, the

22                  iPhone and the iPad." As of January 21, 2011 Apple reports the Apple Store hits

23                  10 billion downloads.

24       96.    Defendant Apple's privacy documents entitled, Apple's "Privacy Policy," dated

25  October 25, 2010, (last accessed  January 21, 2011), states in part:

26      •    "We also collect non-personal information-data in a form that does not permit

27  direct association with any specific individual. We may collect, use, transfer, ad disclose non-

28  personal information for any purpose."

1     •     "We may collect information such as occupation, language, zip code, area code,

2  unique device identifier, location, and the time zone where an Apple product is used so that we

3  can better understand customer behavior and improve our products, services, and advertising."

4     •     "If we do combine non-personal information with personal information the

5  combined information will be treated as personal information for as long as it remains

6  combined."

7     •     "Apple takes precautions-including administrative, technical, and physical

8  measures-to safeguard your personal information against loss, theft, and misuse, as well as

9  against unauthorized access, disclosure, alteration, and destruction."

10     97.    Defendant Apple's Privacy Policy and Terms of Service intentionally, or in the

11  alternative, negligently, fails to reference its association with Defendant Application Developer's

12  Affiliates, thus alleviating the possibility of its user opting-out of the Defendant Application

13  Developer's Affiliates tracking, or in the alternative, negligently omits such association.

14     98.    Defendant Apple's Privacy Policy and Terms of Use intentionally or in the

15  alternative, negligently, fail to reference its association specifically with Defendant Application

16  Developers and Defendant Application Developer's Affiliates, and its use of UDID Tracking. If

17  Plaintiffs and Class Members were adequately informed of Defendants' Application Developer's

18  Affiliates intrusive mobile tracking then they would not have downloaded the iPhone

19  applications.

20     99.    Defendant Flurry does business online, using domains which include but are not

21  limited to: http://www.flurry.com, (last accessed January 25, 2011) Defendant Flurry's business

22  involving web analytics. Defendant Flurry and Defendant Pinch Media merged on December 23,

23  2009.

24     100.   Defendant Flurry's privacy documents, entitled, "Flurry analytics privacy policy,"

25  dated October 1, 2008, (last accessed January 25, 2011), relate to commercial entities and not

26  individual web users, states in part:

27     •     "Personal information does not include "aggregate" information, which is data

28  we collect about the use of the Sites or categories of Site users, from which any personal

1    information has been removed."

2         •       "Flurry may obtain information as a result of data being sent to our servers from

3    our software "agent" that may be embedded in an end user's mobile application. We aggregate

4    that data, which tracks information such as use sessions, an end user's handset, or an end user's

5    country. Once the data is aggregated, we make it available for analysis by the developer of the

6    application."

7         •       "The "Analytics Service" means, collectively, the "Software", the "Reports" and

8    the "Documentation", all as defined below in this Agreement. Under this Agreement, Flurry may

9    allow you to access the Analytics Service by using Flurry's analytics site code and any fixes,

10   updates and upgrades provided to you (the "Agent"), provided that you have an active Flurry

11   account. In addition, Flurry may provide you with on-line access to a variety of analytics reports

12   (the "Reports") generated by Flurry's processing code and any fixes, updates and upgrades. The

13   Agent and Flurry's processing code are defined collectively herein as "Software". The

14   processing code analyzes the data collected by the Agent. This data concerns the characteristics

15   and activities of end users of your applications ("User Data").

16        •       "As a condition of your access to the Analytics Service, you agree that Flurry has

17   the right, for any purpose, to retain, use, and publish in an aggregate manner, subject to the terms

18   of its Privacy Policy located at http://www.flurry.com/legal/privacy.do (or such other URL that

19   Flurry may provide from time to time), information collected in your use of the Analytics

20   Service, including without limitation, User Data."

21        101.   Defendant Medialets does business online, using domains which include but are

22   not limited to: http://www.Medialets.com, (last accessed January 25, 2010) and describes its

23   business as follows:

24        •       "Medialets is the most widely deployed rich media advertising solution for

25   mobile. Medialets brings unprecedented scale to mobile rich media campaigns by enabling the

26   delivery and measurement of the industry's highest-impact rich media across the broadest array

27   of top tier iPhone, iPad and Android apps. NPR, *The New York Times*, *Variety* and *The*

28   *Washington Post*, are just some of the top publishers that have enabled Medialets' cross-platform

1  rich media. Medialets' high-value formats are also available via leading ad networks, ad

2  mediators and ad servers through a preferred partner program,"

3  "Medialets to Enable Mobile Rich-Media Advertising in WeatherBug iPhone and iPad Apps"

4  (last accessed December 17, 2010), online:

5  http://www.forbes.com/feeds/businesswire/2010/09/27/businesswire146044655.html

6        •        "Medialytics, – has been installed over 60 million times across more than13

7  million unique devices to date. Medialytics measures behaviors in many of the top 20 highest

8  downloaded applications on the iPhone platform."

9  "Medialets Surpasses One Billion Actions Processed from within IPhone Applications" (last

10  accessed December 17, 2010), online: http://www.Medialets.com/blog/2009/04/

11        102.   Defendant Medialets' privacy documents entitled, Medialets' "Privacy Policy,"

12  dated January 9, 2009, (last accessed July 11, 2008), relate to commercial entities and not

13  individual web users, states in part:

14        •        "Certain products or services offered by Medialets may require that we collect the

15  phone number and/or other unique identifiers of your users for their device. Some mobile phone

16  service providers are required to record the physical location of all devices that use their service.

17  It is possible that Medialets will receive this information, depending on the mobile phone service

18  provider policies."

19        •        "When users of your applications connect to Medialets services on their mobile

20  devices, we may receive the unique identification of their device or their phone number if

21  provided by their mobile phone service carrier."

22        •        "If users of your applications connect to Medialets services on their mobile

23  devices, Medialets may use the unique mobile device identification or phone numbers provided

24  by carriers to offer users extended services and/or functionality. In some circumstances,

25  Medialets may associate phone numbers or unique identifiers to other information we have

26  collected from and about these users. Medialets will not use phones or unique identifiers for

27  purposes of telemarketing."

28        103.   Defendant Medialets attempts to blur the line between the definition of PII and

non- PII, including but not limited to its interpretation of the data collected by its use of "Fingerprinting" technology on the Plaintiffs' and Class Members' mobile devices. Defendant Medialets attempts to redefine PII by its method of collecting, in that, data anonymously obtained, in whole or part, merged with additional data from other data mining sources, or demographic or behavioral information that is connected to or correlated with an identified individual is not PII.

104.   Medialets' "Privacy Policy," dated July 11, 2008, (last accessed December 7, 2010), does not provide full disclosure as it relates to the purpose of Medialets' affiliate obtaining a user's Unique Device ID ("UDID"), an unknown tracking device, as opposed to cookies, a known tracking device.

105.   Defendant Medialets' Privacy Policy intentionally, or in the alternative, negligently, fails to reference it association with any and all Application Developers or in the alternative, negligently omits such association.

106.   Defendant Medialets' "Terms of Service for Developers," no date noted, (last accessed December 17, 2010), states in part:

- "Advertisements.  The purpose and sole permitted use of the SDK is for you to incorporate software instructions to allow Medialets to insert advertisements ("Ads") from Medialets-designated advertisers ("Advertisers") that may be sourced directly by Medialets or from third parties ("Advertising Agencies") into your Applications.  As a result of using the SDK, you must embed Ad code into your Application at least once.  Notwithstanding anything to the contrary, all Ads, including those displayed within your Applications, are and shall remain the property of the Advertiser. You obtain no rights in any Ads by virtue of utilizing the Medialets Service."

107.   Medialets' Terms of Use and Privacy Policy relate only to individuals that access its website by choice and with actual notice, thus omitting the Plaintiffs and Class Members.

108.   Defendant Pinch Media did business online, using domains which include but were not limited to: http://www.pinch-media.com, (last accessed January 25, 2011 by accessing www.waybackmachine.com) Defendant Pinch Media merged with Defendant Flurry on

1   December 23, 2009. Defendant Pinch Media's business involved web analytics.

2   109.   Defendant Pinch Media's privacy documents entitled, Pinch Media's "Privacy

3   Policy," dated May 28, 2008, (last accessed January 25, 2011), relates to commercial services

4   provided to commercial entities and not mobile device users.

5   110.   Defendant QWAPI does business online, using domains which include but are not

6   limited to: http://www.quattrowireless.com, (last accessed January 25, 2011) is now routed to

7   Defendant Apple's website since Defendant Apple purchased Defendant Quattro Wireless in

8   December 2009. QWAPI's CEO Andy Miller described its business as:

9   •   "Unlike providers of advertising platforms only, Quattro Wireless works with

10   companies to create a complete mobile experience. This does not mean simply pushing text or

11   banner ads on to a website. What it means is that what Quattro Wireless does is re-create the

12   company website (leaving the .com/net URL) and re-create it for mobile. The company has

13   patent pending rendering solutions that recognizes how a consumer is viewing be it mobile or

14   online. The websites displayed will reflect (automatically) the device used. The advertising

15   comes into play after the website has been re-created. Then high quality sponsored ads from

16   Quattro's inventory are pushed to the site."

17   GoMo News, "Chat with Quattro Wireless CEO Andy Miller on differentiation in mobile

18   advertising," (last accessed December 7, 2010), online: http://www.gomonews.com/chat-with-

19   quattro-wireless-ceo-andy-miller-on-differentiation-in-mobile-advertising/

20   111.   Defendant QWAPI's privacy documents entitled, QWAPI's "Privacy Policy,"

21   dated January 9, 2009, (last accessed January 25, 2011), states in part:

22   •   "Personally Identifiable Information (PII)

23   Personally identifiable information (PII) is any information about consumers such as

24   name, address, or email address that is not otherwise available via public sources; provided,

25   anonymous information collected by aggregating volumes of users is not considered PII under

26   this policy. Quattro Wireless builds and hosts mobile websites for our clients; PII may be

27   collected in the course of a web site visit as part of the users' interactions with that site. When PII

28   is collected in this manner, this PII data is the property of our website partners and is subject to

1   their privacy policy. Quattro Wireless may not use this data in any way that is not authorized by

2   our website partners, and we will not use PII for ad targeting or for any other purpose."

3       112.   Defendant QWAPI attempts to blur the line between the definition of PII and non-

4   PII, including but not limited to its interpretation of the data collected by its use of

5   "Fingerprinting" technology on the Plaintiffs' and Class Members' mobile devices. Defendant

6   QWAPI attempts to redefine PII by its method of collecting, in that, data anonymously obtained,

7   in whole or part, merged with additional data from other data mining sources, or demographic or

8   behavioral information that is connected to or correlated with an identified individual is not PII.

9       113.   QWAPI's "Privacy Policy," dated January 9, 2009, (last accessed January 25,

10   2011), does not refer to its use of a Global Unique ID ("GUID") an unknown tracking device, as

11   opposed to cookies, a known tracking device.

12       114.   Defendant QWAPI's Privacy Policy intentionally, or in the alternative,

13   negligently, fails to reference it association with QWAPI Affiliates or in the alternative,

14   negligently omits such association.

15       115.   QWAPI's Terms of Use and Privacy Policy relate only to individuals that access

16   its website by choice and with actual notice, which excludes any method or means involving

17   browser hijacking; thus omitting the Plaintiffs and Class Members.

18       116.   Defendant Application Developer's Terms of Service and Privacy Policy do not

19   reference notice that iPhone user's mobile devices' UDID shall be obtained for tracking

20   purposes, provided to Application Developer Affiliates, and used to build a profile data collected

21   of any and all user's mobile device activities. Many application developers do not even provide

22   any Terms of Service and/or privacy policies.

23       117.   Some Application Developers have amended its Terms of Service and/or privacy

24   policy since studies revealed iPhone applications were obtaining UDIDs, including but not

25   limited to, Defendant Pandora, which omitted such within its prior privacy policy of April 18,

26   2010:

27       •     "Information about your computer or device: We may also collect information

28   about the computer, mobile or other devices you use to access and listen to the Service. For

1   example, our servers receive and record information about your computer and browser, including

2   potentially your IP address, browser type, and other software or hardware information. If you

3   access the Service from a mobile or other device, we may collect a Unique device identifier

4   assigned to that device or other transactional information for that device." Pandora Media, Inc.

5   privacy policy effective as of January 11, 2011.

6                            **FACTUAL ALLEGATIONS**

7   **A. Background**

8        118.   In 1999 Intel released the "Pentium 3" and each processor included a unique

9   serial number which could be read by any software installed on the system. Consumers, privacy

10  groups, and legislative authorities voiced outrage and privacy concerns and Intel was forced to

11  remove this function. In 2007 Apple released the iPhone and each included a unique software

12  visible serial number called a Unique Device Identifier ("UDID"). On July 10, 2008 Apple's

13  "App Store" was launched as a service for the iOS devices, (the iPhone, iPod Touch and iPad),

14  and permitted users to download applications from the iTunes store. Recent studies though

15  revealed that Apple had transmitted, or allowed access to, user's UDIDs, without authorization,

16  allowing Application Developers, and Application Developers Affiliates to obtain users' UDIDs

17  for tracking users' mobile device activity. As of January 21, 2011, Apple reported that 10 billion

18  applications had been downloaded. In light of the privacy concerns Apple should not have placed

19  this product in its current iteration into the marketplace at all and has failed to withdraw such

20  upon notice if privacy concerns, nor make adequate privacy and security alterations. The Intel's

21  Pentium 3's crisis pales in comparison to the recent Apple's UDID privacy implications.

22       119.   Consumers need products that provide strong security, offer robust and varied

23  authentication tools to support electronic commerce, and protect individual privacy and

24  anonymity. Apple unique identifier does not meet this standard, because, the privacy risks

25  inherent in this unique ID feature outweigh the benefit it potentially provides. The objective of

26  the Defendants' business practices was the unauthorized transmittal, access, collection, and use

27  of, the mobile devices data, on a systematic and continuous basis, in order to perpetually harvest

28  the Plaintiffs' and Class Members' sensitive and personal identifying information from their

1    mobile device browsing activities.

2        120.    This consumer class action involves a pattern of covert mobile device

3    surveillance, wherein the Defendants, operated individually, and in concert, associated in fact,

4    and targeted Internet users that visited the Apple iTunes Store and downloaded iPhone

5    applications, to knowingly, and without the user's knowledge or consent; commit unauthorized

6    transmittal, access, collection, and use of, a Unique Device Identifier ("UDID"), derived from

7    the Plaintiffs' and Class Members' mobile device, then transmitted a program, information, code,

8    and command, to collect, monitor, and remotely stored mobile device data aggregated by the

9    UDID, in order to obtain data for tracking the Plaintiffs and Class Members.

10    **B.  Mobile Tracking**

11        121.    Traditional online advertising practices, such as the tracking of individual users

12    across sessions and controlling the frequency and relevance of advertising presented to them,

13    simply do not exist in the mobile Internet today.

14        122.    Mobile Internet advertising currently consists of streaming graphic files, in real

15    time, into content rendered by a user's mobile device browser. Image and text call to action

16    advertising tags that are embedded in the content at a publisher's content management system.

17    This occurs prior to delivery of the actual content to the user over the wireless network. Current

18    mobile practice for many of the server side include ad serving systems, so as to log delivery of

19    user impressions when the ad tags are transmitted from the ad server, across the Internet to the

20    publisher's content system.

21        123.    Mobile advertising systems lack reliable browser tracking while traditional online

22    advertising relies on the use browser cookies, implementations inherent in conventional

23    implementations of mobile ad serving have effectively prevented mobile advertising from being

24    effective.

25        124.    The lack of standard advertising metrics for mobile campaigns has discouraged

26    online advertisers from taking advantage of the unique personalized nature of mobile devices and

27    local content. Due in part from the inability of the mobile advertising industry to incorporate web

28    analytics.

125.   There are basically two approaches to collecting web analytics data. The first, "page tagging," uses a small bit of JavaScript code placed on each web page to notify a third-party server when a page has been viewed by a web browser. Etags can be used in place of cookies. They are a part of caching in HTTP: The server sends the user the tag, and when the user accesses the resource again their web browser sends the tag back. The server uses the tag the browser sent to decide whether to send the user the data or provide data to the browser that the data hasn't changed, and to keep using the old copy.

126.   The second and more traditional approach to web analytics is "log file analysis", where the log files that Web servers use to record all server transactions are also used to analyze website traffic.

127.   All Internet advertising, online or mobile, seeks "state maintenance" or the idea that the person/browser/phone that saw the ad performs some later activity. Because most mobile phones don't support fully functional browsers, they also don't obtain "uniqueness," necessary to obtain "state maintenance." Obtaining the user's IP address won't work because most mobile phones don't have a public IP address. They access the web through Network Address Translation at the carrier, meaning that many phones are seen by the entire web as all one IP.

128.   In order to obtain "uniqueness" in mobile devices, the key was to obtain a Unique Device Identifier or "UDID," a special type of identifier used in software applications to provide a unique reference number in mobile devices. Unlike traditional cookies, a user has no choice whatsoever here. A user can't opt-out, since it is always sent. It can't be deleted since it always stays the same. A user cannot use a block UDID transmitted, as they would in a browser, since it is hard coded into a user's phones software. Defendant Apple accomplished the task of obtaining device uniqueness, and Defendants reaped the benefits.

129.   Prior to Defendant Apple's UDID, Application Developers were limited to a unique identifier, hereinafter referred to as a Global Unique Identifier ("GUID"), which originates from a device registering at a website, online store, Web Analytic Vendors or by the ad networks. "GUID's" created by application developers provides functionally that allows application developers to uniquely identify the user for purposes such as storing application

preferences or video game high scores, playlists, etc. In some cases personal contact information and authorization to other linked accounts is also provided. This is so users don't need to register or log on. The GUID does facilitate the process of collecting and storing certain types of data, but also provides a tempting opportunity for use as a tracking agent to correlate with other personally-identifiable information but a GUID is not a UDID, nor does it have the benefits of a UDID.

130.   Tracking by use of a UDID is not exactly comparable any other type of tracking by advertising networks. It's not anonymous data – it's an exact ID that's unique to each physical device, and if merged with GPS data, it provides unlimited advertising opportunities. When tracking your location data on the mobile device, it is calculated to 8 decimal points that can be far more exact and accurate than any sort of geographically-based IP address look-up on the web. Instead of getting a general location, location data on a GPS-enabled mobile can identify your precise latitude and longitude.

131.   Advertising networks and mobile analytic companies obtain UDIDs to have visibility across all of its applications, so tracking is consistent regardless of an individual's location or connection. It is not anonymous tracking, since it runs at the application layer, the same layer that a web-browser runs already therefore its stats involve information which has nothing to do with user metrics or usage. Security violations occur when the device identifier is combined with the following attributes: authenticated login information (e.g. a banking application can link the UDID with a full banking consumer profile), (nick)name of iOS device owner, type of connection (e.g. Wi-Fi versus 3G), model type (version of mobile device), home address, phone number, and geo-location information. While the UDID does not exist for nefarious reasons, its use can be for nefarious purposes.

132.   The advertising and marketing industries have been strongly advancing technical means of synchronizing tracking code so that information about individual consumer behavior in cyberspace can be shared between companies and the UDID used in the majority of mobile devices would be put to this purpose. The records of many different companies are merged without the user's knowledge or consent to provide an intrusive profile of activity on the

1   computer. There are no practical limits on what can be collected or used.

2       133.   Many advertising and behavioral tracking systems that use the UDID, without the

3   customer's knowledge or consent, brag about its ability to report on every action a user took

4   within an app: every button click, every page viewed, every table cell viewed, and the time a

5   person took between each action, all sent back to the server without any notification or customer

6   access to that information. Thus, UDIDs are most useful to people who want to track and collect

7   user behavioral data without user notification or permission (ad networks and behavioral

8   monitors). And since the UDID is the same for every app on a device, this is a boon to

9   advertisers and other data aggregators. The mobile advertising world will no longer have to place

10  a cookie to track a user across sites/apps, the UDID is like a permanent cookie that the user

11  cannot turn off.

12      134.   Defendants' Application Developers and Application Developers Affiliates'

13  technology, made the basis of this action, is basically using some of the modern HTML5

14  capabilities of mobile browsers to perform the same tasks as a traditional cookie, but out of sight

15  of most users and while it is not technically a mobile cookie since it's not browser based, is on

16  the server side, thus it cannot be affected by anti-cookie technologies employed by carriers such

17  as gateway stripping (a technique that renders the cookies useless or unreliable for ad targeting),

18  and preventing users from deleting them. Wireless carriers typically prevent outside firms from

19  embedding such information in mobile devices. To get around the carriers, it embeds its digital

20  code in servers rather than browsers, since most mobile devices forbid the use of third party

21  software in Applications to collect and send Device Data to a third party for processing or

22  analysis, banning "Third Party" Analytics.

23      135.   In a non-technical version, what Application Developer's Affiliates do is have its

24  application developers include a small JavaScript in its application. An invisible iFrame is

25  created which loads code from the iPhone application. It determines if it has seen the user before

26  and initiates a database (for the domain) and then communicates through iFrame message-

27  passing to its client that it should create a mirror of this database for the iPhone application

28  domain.

136.   Application developer's affiliates develop and sell tools to track, collect (and store) data and analyze mobile and Internet-enabled apps to facilitate advertising or assist developers build applications. In the final analysis, the developer/application publisher should also be held responsible for any and all data privacy violations.

137.   By piggy backing on Applications, Defendant Application Developers Affiliates gains access to the richest customer metrics with the shortest distance to customer purchase decisions and the sales funnel. Web analytic vendors track app usage, but also attract advertisers to both for third-party applications and for Application Developers Affiliates service itself. The web analytics vendor is also involved in an ad-insertion technology in addition to involvement in the ad network. Mobile analytics serves the purpose of an optimization tool to help increase app downloads and sales.

138.   Developing an account creation system is time consuming and costly, and thus the majority of application developers who don't need multi-device accounts choose to use the UDID instead of its own GUID to save time and money. As such, Apple incentivizes developers to use the UDID by not providing them with a similarly useful privacy-enhanced customer identification tool. The UDID privacy risks could have been mitigated though by Apple if an identifier would have been used that was unique for the combination of application and device if the device returned to a program different for each app.

139.   Application Developer's Affiliates offer "free" software kits; (hereinafter referred to as "SDK's"), that application developers download and insert into its application. A software development kit ("SDK") is typically a set of development tools that allows for the creation of applications for a certain software package, software framework, hardware platform, computer system, video game console, operating system, or similar platform. It may be something as simple as an application programming interface (API) in the form of some files to interface to a particular programming language or include sophisticated hardware to communicate with a certain embedded system. Often the SDK can be downloaded directly via the Internet. Many SDKs are provided for free to encourage Application Developers to use the Application Developer Affiliates system or language.

1    140.   The spectrum of mobile analytics involve "application analytics" aimed at

2    application developers, "campaign analytics" aimed at optimizing tools for media companies,

3    and "service analytics," aimed at providing platforms for data mining networks or mobile device

4    data.

5        141.   SDK's though provided Application Developer Affiliates the access to

6    Application users when Application Developers downloaded the Application Developer

7    Affiliates' SDK into its application; such provided the ability to obtain the Plaintiffs' and Class

8    Members' UDID and to conduct cross application tracking, activities made the basis of this

9    action. Application Developers Affiliates allowed application developers such access to as to

10   monetize its application:

11       •     "Make dollars and sense from your apps. Medialytics™ is a powerful tool that

12   allows mobile app developers and advertisers to gain key insights into their apps and understand

13   their users like never before. Create an Account. It's free! Make enlightened improvements to

14   your app based on measurable insights into user behavior. Use the comprehensive Dashboard to

15   monitor the metrics that matter most at a glance. Define Any Custom Events in your app that

16   you'd like to monitor and Medialytics™ delivers an even more intimate understanding of your

17   users' behavior. Create an Account"

18   Medialytics, (last accessed February 8, 2011), online: http://www.medialytics.com/

19       142.   The SDK's also involve tracking libraries whose sole purpose is to collect and

20   compile statistics on application uses and usage, and send the device ID as part of their

21   functionality. Most of these libraries are used to display advertisements so as to provide revenue

22   for the application developer; and the mechanism for the libraries to also provide the mobile

23   device's UDID once the user installed applications.

24       143.   Client libraries available for iPhone were created using open source SDK for,

25   consistency and easy integration. The client libraries also provide flexibility for deeper

26   integrations and customization. Once integrated with an app, the client library sends function

27   calls (Required: open, upload, close. Optional: tagEvent, setOptIn / isOptIn.) to control a session.

28   These calls to the server can be uploaded upon start of the application (recommended) to place

1   one single server call with batched information or can be configured to fire more or less

2   frequently. Analytic data is written to persistent storage immediately after it's recorded and is

3   available within the user interface in real-time.

4       144.   Basically, Web Analytics consist of a library that is compiled into and iPhone

5   application and a web service. Generally, when the application starts, it pings the web service

6   with a small amount of information and when the application is about to terminate, it pings the

7   service again. The developer may also choose to ping the service at other various points in the

8   application. These pings are then aggregated on the server into various reports. The UDID data

9   will also be sent in the ping so they know what app to count the ping on.

10      145.   A user's UDID without user's mobile device data may not be linked directly to a

11  user; however "Libraries" of data exist, such as Facebook where an application developer can

12  use such to integrate Facebook library with the apps thus connecting the user's UDID to the user.

13  The Facebook connect on the iPhone allows the app developer to obtain a Facebook ID, once a

14  user is logged in, and then the app developer can link the UDID to a Facebook account in order

15  to link user to a mobile device.

16      146.   Game app developers, using user's high scores, can also be tracked if a UDID is

17  obtained from a mobile device and related to an application instead of relying only on the UDID

18  itself. Such would prevent such analytic libraries from building usage profiles per mobile device.

19      147.   Defendants Application Developers Associates collect mobile device data,

20  including the user's UDID, aggregate such into a variety of reports, merging data from all

21  associated applications, to produce reports by price point, application category, operating system

22  and various other criteria. The aggregated data is then impossible to determine which application

23  data supplied the specific processor data. Application developers then can claim they did not

24  provide all of the user's data, but only part of the data.

25      148.   The SDKS enable application developers to track usage of its app in real time and

26  just as if it were a website. First, the application developer identifies the places in its app where it

27  would like to trigger a page view or an event, and then uses the SDK's to send these events to

28  Web Analytics Vendors.

149. Application Developers Analytics reports are now available for mobile websites by simply pasting server-side code snippets (available for PHP, JSP, ASP, NET, and PERL) on each page they wish to track. Web Analytics vendors then create a profile for their mobile website where they can view the same kind of information that's in standard Analytics reports including visitor information and traffic sources, including tracking users visiting their mobile websites form both high-end "smartphones" and WAP devices.

150. Apple's iPhone is involved in the largest release, collection, and use of user data in history. iPhone app's and ADA's are involved in a data mining feeding frenzy, like pyromanias feeding on a prey, devouring user's data "To The Bone".

C. **Defendants' Release of UDIDs- Studies**

151. When Apple addressed a congressional inquiry on privacy in July, 2010 Apple claimed its transactions were anonymous and thoroughly randomized. Recent Studies however exposed that Apple's business practices with iPhone application developers and third party web analytic vendors, such as Defendant Application Developer's Affiliates, does not confirm this opinion.

152. On September 28, 2010, a joint study by Intel Labs, Penn State, and Duke University was released which identified that publicly available cell-phone applications from application markets were releasing consumers' private information to online advertisers. In a study of 30 popular applications, TaintDroid revealed that 15 send users' geographic location to remote advertisement servers. The study also found that seven of the 30 applications send a unique phone (hardware) identifier.

• Our experimentation indicates these fifteen applications collect location data and send it to advertisement servers. In some cases, location data was transmitted to advertisement servers even when no advertisement was displayed in the application.

William Enck, Peter Gilbert, Byung-Gon Chun, Landon P. Cox, Jaeyeon Jung, Patrick McDaniel, Anmol N. Sheth, "TaintDroid: An Information-Flow Tracking System for Realtime Privacy Monitoring on Smartphones" (last accessed September 28, 2010), online:

http://www.appanalysis.org/tdroid10.pdf

153.   On October 1, 2010, a second study, written by Eric Smith, Assistant Director of Information Security and Networking at Bucknell University, raised similar privacy questions about how Unique Device Identifiers ("UDIDs") could be used to track how customers use applications associated with the device, how developers can access a device UDID, and correlate it with personally identifiable information:

•       A number of applications which have the potential to map UDID to user identity were studied to determine if they are actively collecting UDID data. UDID collection by applications requesting user credentials. Of the applications evaluated in this study that collected UDIDs require users to log in, and have personally-identifiable information affiliated with user accounts, 30% clearly transmit UDIDs; the rest used SSL to encrypt data transmission.

•       Of those, 68 percent transmitted UDIDs to servers under the control of developers or advertisers, while another 18 percent sent encrypted data that could have included the unique serial number. Just 14 percent of the apps were confirmed not to send UDIDs.

•       It is clear from this data that most mobile device application vendors are collecting and remotely storing UDID data, and that some of these vendors also have the ability to correlate the UDID to a real-world identity.

•       A number of the applications considered in this study requested access to the on-board GPS receiver. Several such applications – games, for example -- had no obvious need for this information. In several cases, applications which transmitted UDIDs were observed to transmit the mobile device's latitude and longitude as well.

Eric Smith, "iPhone Applications & Privacy Issues: An Analysis of Application Transmission of iPhone Unique Device Identifiers (UDIDs)" (last accessed January 20, 2010), online:

http://www.pskl.us/wp/wp-content/uploads/2010/09/iPhone-Applications-Privacy-Issues.pdf

154.   On December 17, 2010, a third study, by David Campbell and Ashkan Soltani revealed that iTunes application were transmitting UDIDs:

•       An examination of 101 popular smartphone "apps"—games and other software applications for iPhone and Android phones—showed that 56 transmitted the phone's unique device ID to other companies without users' awareness or

1    consent. Forty-seven apps transmitted the phone's location in some way. Five sent

2    age, gender and other personal details to outsiders.

3        •    Many apps don't offer even a basic form of consumer protection: written privacy

4    policies. Forty-five of the 101 apps didn't provide privacy policies on their

5    websites or inside the apps at the time of testing. Apple requires app privacy

6    policies to?

7    David Campbell and Ashkan Soltani, Electric Alchemy.net, "The Journal's Cellphone Testing

8    Methodology," (last accessed January 20, 2011), online:

9    http://online.wsj.com/article/SB10001424052748704034804576025951767626460.html

10        155.    On January 24, 2011, a fourth study by the Vienna University of Technology,

11    Austria was released which confirmed previous studies that iPhone applications were obtaining

12    UDIDs:

13        •    "To show the feasibility of our approach, we have analyzed more than 1400

14    iPhone applications. Our results demonstrate that a majority of application leak the device ID."

15        •    "While not directly written by an application developer, libraries that leak device

16    IDs still pose a privacy risk to users. This is because the company that is running the

17    advertisement or statistics service has the possibility to aggregate detailed application usage

18    profiles. In particular, for a popular library, the advertiser could learn precisely which subset of

19    applications (that include this library) are installed on which devices. For example, in our

20    evaluation data set, AdMob is the most-widely-used library to serve advertisements. That is, 82%

21    of the applications that rely on third-party advertising libraries include AdMob. Since each

22    request to the third-party server includes the unique device ID and the application ID, AdMob

23    can easily aggregate which applications are used on any given device."

24        •    "Obviously, the device ID cannot immediately be linked to a particular user.

25    However, there is always the risk that such a connection can be made by leveraging additional

26    information. For example, AdMob was recently acquired by Google. Hence, if a user happens to

27    have an active Google account and uses her device to access Google's services (e.g., by using

28    GMail), it now becomes possible for Google to tie this user account to a mobile phone device.

1    As a result, the information collected through the ad service can be used to obtain a detailed

2    overview of who is using which applications. Similar considerations apply to many other

3    services (such as social networks like Facebook) that have the potential to link a device ID to a

4    user profile (assuming the user has installed the social networking application). The

5    aforementioned privacy risk could be mitigated by Apple if an identifier would be used that is

6    unique for the combination of application and device. That is, the device ID returned to a

7    program should be different for each application."

8         •    "The unique device ID of the phone is treated differently and more than half of

9    the applications leak this information (often because of advertisement and tracking libraries that

10   are bundled with the application). While these IDs cannot be directly linked to a user's identity,

11   they allow third parties to profile user behavior. Moreover, there is always the risk that outside

12   information can be used to eventually make the connection between the device ID and a user."

13   Manuel Egele, Christopher Kruegel, Engin Kirda, and Giovanni Vigna, "PiOS: Detecting

14   Privacy Leaks in iOS Applications" (last accessed January 24, 2011), online:

15   http://www.iseclab.org/papers/egele-ndss11.pdf

16   **iPhone Accessible Data**

17        *"It is a little known fact that, despite Apple's claims, any applications*

18        *downloaded from the App Store to a standard iPhone can access a significant*

19        *quantity of personal data."*

20   Nicolas Seriot, "iPhone Privacy" (last accessed January 6, 2011), online:

21   http://seriot.ch/resources/talks_papers/iPhonePrivacy.pdf

22        156.   Traditional online advertising does not obtain a UDID of user's mobile device.

23   The Defendants' objective was not traditional and included, but was not limited to, obtaining a

24   mobile device "Fingerprint," a practice of obtaining device information to perpetually identify

25   the mobile device as "indirect identification," which can then be linked to additional data

26   elements to identify "personable identifiable information" ("PII"), personal information and/ or

27   sensitive information:

28        *"If we ask whether a fact about a person identifies that person, it turns out that*

> *the answer isn't simply yes or no. If all I know about a person is their ZIP code, I*
> *don't know who they are. If all I know is their date of birth, I don't know who they*
> *are. If all I know is their gender, I don't know who they are. But it turns out that if*
> *I know these three things about a person, I could probably deduce their identity!*
> *Each of the facts is partially identifying."*

Electronic Frontier Foundation, Technical Analysis by Peter Eckersley, "A Primer on Information Theory and Privacy" (last accessed October 15, 2010), online:
http://www.eff.org/deeplinks/2010/01/primer-information-theory-and-privacy

157. The collection, use and disclosure of tracking data, such as obtaining a users' UDID by Defendants to provide its services, implicates Plaintiffs' and Class Members' privacy and physical safety. Such Information is afforded special attention due to the consequences for both privacy and physical safety that may flow from its disclosure. The heightened privacy and physical safety concerns generated by the collection, use and disclosure of location information are apparent in U.S. law that creates restrictive consent standards for its use and disclosure in the private sector in the context of telecommunications services.

158. "Apple's release of its users' UDID has the potential to transform the World Wide Web from a largely anonymous environment into one where individuals are expected, or even required, to identify themselves in order to participate in online activities, communicate, make purchases, and would represent a grave erosion of consumer's online privacy. Many of the activities that individuals engage in on the Web do not require the collection of identifiers or personal information of any type. "Free" applications involve a user not paying for a product, but a paying with their personal information, which becomes the actual product.

159. Due to Apple's market dominance, the UDID has the potential to become the unique identifier for nearly everyone on the Internet -- fundamentally changing the Web experience from one where consumers can browse and seek out information anonymously, to one where an individual's every move is recorded. Our society's experience with unique identifiers suggests that embedding the UDID into mobile devices will erode individual privacy. The history of the Social Security Number reveals the unrelenting pressures to expand the use of

1    an identifier once it is created -- even where its use is initially curtailed by federal policy. Once a

2    unique identifier capable of identifying and tracking individuals in the online environment is

3    created, it will be far more difficult to limit its use. However, if an individual's browser is set not

4    to prompt prior to executing programs, then the alien program will read the UDID without the

5    individual's knowledge or consent. The Social Security Number (SSN) offers a compelling

6    example of how a unique identifier can undermine individual privacy and become a de facto

7    national identifier; the UDID has the potential though to further the surreptitious collection and

8    use of data without an individual's consent. Unlike a real world identifier, such as the Social

9    Security Number, the UDID, a virtual identifier, is capable of being collected without the

10   individual's knowledge and consent.

11        160.   Defendant Apple has entered in a licensing agreement with a substantial amount

12   of application developers, numbering in the thousands that are without restraint or control by

13   Apple, accessing at will any and all Plaintiffs' and Class Members' mobile device data.

14   Interpretation of the Apple EULA is varied among Application Developers but provides insight

15   to present privacy concerns, made the basis of this action:

16   [Name and service redacted for privacy reasons] said on February 2nd, 2011 at 12:32 PM:

17        •    "I myself am an iOS developer. You are running the app under the developers

18   EULA (which is really provided by apple). The EULA allows our apps to access your data. You

19   gave us permission to do so when you accepted the iTunes terms and conditions and when you

20   purchased the app."

21   [Name and service redacted for privacy reasons] said on February 2nd, 2011 at 12:54 PM:

22        •    "I am thoroughly familiar with Apple's iOS developers' agreement, and it does

23   not permit developers' apps to access at least certain customer's information that is categorized

24   as personal information.  To access that information through an app, the developers must ask the

25   customer's permission to do so in the app.  If the customers refuse to consent, the only option for

26   the developer is to either change the terms or not provide the app."

27        161.   While the Defendant's Apple's UDID provides an aggregate point of reference,

28   the secondary issue is the mobile device data that was obtained. The recent studies noting that

1  UDIDs were being provided from Defendant Apple to Defendant Application Developers and

2  Defendant Application Developer Affiliates revealed some, but not all, of the mobile device data

3  being transmitted and accessed by such parties. A study by Nicolas Seriot, "iPhone Privacy,"

4  describes a comprehensive list of potentially sensitive information that can be accessed by iOS

5  applications, methods to access such data, and comments:

6      •     Access to the address book

7      •     Current GPS coordinates of the device

8      •     Unique Device ID

9      •     Photo Gallery

10      •     Email account information

11      •     WiFi connection information

12      •     Phone related information (Phone #, last called, etc.)

13      •     Youtube application (watched videos and recent search)

14      •     MobileSafari settings and history

15      •     Keyboard cache

16      162.    The Seriot study provides an in depth analyses of the entry points to obtain

17  sensitive and personal identifying information:

18      •     "The first and easiest item of personal data to collect is the user's phone number.

19      •     Another way to collect personal data is through the Address Book API. It turns

20  out that the full Address Book is readable without the user's knowledge or consent. It contains

21  names, users' phone numbers and email addresses, but also a "notes field", in which many Mac

22  users store sensitive data such as door codes or bank accounts.

23      •     Next, we consider the data that can be read on the iPhone file system. A

24  sandboxing mechanism limits access to other application's data. Third party applications are

25  installed in /private/var/mobile/Applications/ and are prevented from seeing each other or

26  accessing specific location. About the sandboxing mechanism, Apple writes: Applications on the

27  device are "sandboxed" so they cannot access data stored by other applications. In addition,

28  system files, resources, and the kernel are shielded from the user's application space. It turns out

1   that, despite sandboxing, numerous system and application preference files are in fact readable

2   (see listing 2) by downloaded applications, and some of them contain personal data.

3   •      Read the iPhone UUID (through a documented API), the ICCID (SIM card serial

4   number) and the IMSI (International Mobile Subscriber Identity), making it possible to track

5   users even when they change their device. IMSI reveals the country and the mobile operator.

6   •      The keyboard cache contains all the words ever typed on the keyboard, except the

7   ones entered in password fields. This is supposed to help auto completion but this mechanism

8   effectively acts as a key-logger, storing potentially private and confidential names and numbers.

9   •      Any application has read and writes access to the DCIM directory that contains

10  the photos stored in the iPhone. By default, these photos are tagged with the GPS coordinate.

11  •      Another file keeps track of every time you join a WiFi network. Based on these

12  logs, it is possible to gain insights into the user recent' whereabouts.

13  •      Safari recent searches (figure 3), YouTube history (figure 4) and your keyboard

14  cache (figure 8) give clues about your current interests. These interests are linked with your

15  name and your email addresses (figure 6), your phone number (figure 5) and your area (figure

16  12). Harvested from large numbers of users, such data have a huge value in the underground

17  market of personal data, and it must be assumed that trojans are in fact exploiting this on the App

18  Store.

19  •      To be published on Apple's App Store, an application must be submitted by a

20  developer enrolled in the (paid) "iPhone Developer Program"24. Apple only gets the executable

21  file, not the source code. Note that even if Apple had access to the source code, it probably could

22  not afford a full security code review.

23  •      A breakout game is made available for free on Apple's App Store. While you are

24  playing breakout, it reads your email address, your recent Safari searches, your weather cities

25  and the words contained in your keyboard cache. When you submit your high score to the

26  application's server, stolen information is sent at the same time in an encrypted form. The

27  application also sends all the email addresses in your address book.

28

1       •    First of all, Apple should stop claiming [1] that an application cannot access data

2 from other applications.

3       •    There is no reason why the WiFi connection logs should be readable. The same

4 applies to the keyboard cache, which should be an OS service associated with text fields. It

5 should not be possible to retrieve their whole contents.

6       •    The iPhone clearly lacks an optional outbound firewall similar to Little Snitch on

7 the Mac. Such a service would allow people to opt-out from the various analytics frameworks.

8       •    At the end of the day, the fact that so many developers use analytics frameworks

9 may be a hint to Apple to give more usage information to developers, and provide users a setting

10 to opt-out.

11       •    Users should be required to grant access to the Address Book (see 4.2.2)

12 individually for each application, as is currently the case for the Core Location framework. A

13 breakout game has no business accessing your contacts.

14       •    Device unique identifier- The device unique identifier is currently available

15 through the official SDK's API. While it is not personal data since it cannot identify a physical

16 person, it may be used to aggregate data collected from various applications and analytics

17 frameworks. As a general rule, an application should not be able to know which other

18 applications you have run. Users merely accept cross-site cookies on the web; they probably

19 would not accept their computer's unique identifier to be transmitted to Google Analytics. A

20 possible solution for Apple would be to add something like an app device identifier or ADID.

21 This value would be unique for a given device and the requesting application. The current device

22 unique identifier could be kept, but the user should be asked to allow or deny its usage, as with

23 Core Location."

24 Nicolas Seriot, "iPhone Privacy" (last accessed January 28, 2011), online:

25 http://seriot.ch/resources/talks_papers/iPhonePrivacy.pdf

26 **D. "Bandwidth Hogs"-Economic Harm**

27     163.   The Defendant's activities, made the basis of this action includes, but is not

28 limited to, economic harm due to the unauthorized use of Plaintiffs and Class Member's

1 Bandwidth.

2     164. Bandwidth is the amount of data that can be transmitted across a channel in a set

3 amount of time. Any transmission of information on the internet includes bandwidth. Similar to

4 utility companies, such as power or water, the "pipeline" is a substantial capital expenditure, and

5 bandwidth usage controls the pricing model. Hosting providers charge user's for bandwidth

6 because their upstream provider charges them and so forth until it reaches the "back bone

7 providers". Retail providers purchase it from wholesalers to sell its consumers.

8     165. "Unlimited" plans are not unlimited. Major provider plans may refer to its plans

9 as unlimited for marketing purposes, but the plans have limitations, usually noted in a footnote or

10 link to another page discussing its limitations as to usage amounts. Providers could not possibly

11 allow "unlimited" plans because servers do not have unlimited amounts of space. "Unlimited"

12 Data plans used to be unlimited until people started to figure out how to" tether", a method for

13 connecting a computer to the internet via an internet-capable mobile phone. The term

14 "unlimited" then is used to define what is considered to be more than a reasonable amount of

15 data allotment.

16     166. Network provider's data plans charge consumers based upon items such items as

17 usage and "caps", ie $30.00 per month for an unlimited plan is standard, but limited plans have

18 caps, such as: 256 GB per month. Some national providers charge $1.00 per GB of bandwidth

19 exceeding a certain cap. Whether the data plan is marketed as "unlimited" or "limited", the costs

20 for the plans are allocated based upon the bandwidth usage, thus as the standard use of

21 bandwidth increases, so too does the plan costs increase. Since plans are based upon user's

22 average use, as consumer's usage increases collectively, costs increase for all users, while

23 individual bandwidth overages can be costly:

24         "AT&T never mentions specific rates for data overages in its rate plan

25         terms, but the company does say that it will notify users before imposing

26         additional charges and that it will give users the right to terminate their service

27         beforehand if they don't wish to pay the charges.

28         The company has also posted specific data overage rates for its

1    DataConnect plans. According to AT&T's Web page detailing available data rate

2    plans, users who pay $60 for their DataConnect services get a monthly 5GB

3    bandwidth cap and are to pay $0.00048 per additional kilobyte of data they

4    consume, or about $500 per every gigabyte over the cap. Thus, a user who

5    consumed three times the amount of data allowed by the company's bandwidth

6    cap would be charged about $5,000 extra per month."

7    Brad Reed, "User sues AT&T over $5,000 Web bill" (last accessed January 14,

8    2011) online: http://www.apple.com/legal/mobileme/en/terms.html

9        167.    Limitations on bandwidth use are also not only controlled by the providers, but

10   also mobile device providers such as Defendant Apple:

11        **"Limitations on Use"**

12            You agree to use the Service only for purposes as permitted by these TOS

13   and any applicable law, regulation, or generally accepted practice in the

14   applicable jurisdiction. Your MobileMe account is allocated certain levels of

15   storage capacity and bandwidth for network traffic and email as described in the

16   MobileMe feature pages. Exceeding any applicable limitation of bandwidth or

17   storage capacity (for example, iDisk or e-mail account space) is prohibited. To

18   view your current storage and data transfer or bandwidth allocations, log in to

19   your MobileMe account page at http://secure.me.com/account. In addition, if

20   there is Excessive Usage on your account or any Sub-account (as defined in

21   Section 3 below), Apple reserves the right to temporarily disable access to

22   information available from your account through a URL, or to 'bounce" emails

23   back to senders. "Excessive Usage" as used herein, may apply to storage and/or

24   bandwidth capacities, and means your usage within a given month or day (as

25   applicable) greatly exceeds the average level of monthly or daily usage of

26   MobileMe's members generally. Repeated violations may result in termination of

27   your account Apple reserves the right to modify these limitations on use at any

28   time."

168.   The technology behind the World Wide Web is the Hypertext Transfer Protocol (HTTP) and it does not make any distinction as to the types of links, thus all links are functionally equal. Resources may be located on any server at any location. When a web site is visited, the browser first downloads the textual content in the form of an HTML document. The downloaded HTML document may call for other HTML files, images, scripts and/or style sheet files to be processed. These files may contain tags which supply the URL's which allow images to display on the page. The HTML code generally does not specify a server, meaning that the web browser should use the same server as the parent code. It also permits absolute URLs that refer to images hosted on other servers. Once the application has stored the data, it will attempt to send information back to application developer affiliate's servers. In most cases this is done every time you open & close application. The data is continually tracked. An application developer affiliate's enabled application does not take just one sample, it will record every use of the application for the life of that application on your phone and your information is sent automatically at a user's expense.

169.   Ads consume vast amounts of bandwidth, slowing a user's internet connection by using their bandwidth, in addition to diminishing the mobile devices "Battery Life", in order to retrieve advertisements. Web Analytics use up more bandwidth than ads, accessing bandwidth to download and run ad script, thus Plaintiffs and Class members that did not access ads on an application still had the Defendant's Application Developer and Defendant Application Affiliate use their bandwidth.

170.   Advertisers are now using the internet as their primary ad-delivery pipe, continually upcoming and downloading data from its networks causing substantial bandwidth use. Ads that were hidden in content, or bundled, used substantial bandwidth, as did Application updates. Web analytics activities delayed movement on a site, causing users to use their bandwidth, to complete its data mining activities.

171.   Defendant Application Developers and Defendant Application Developers Affiliates used ad content, such as streaming video on audio, that required excessive Plaintiff and Class Member's bandwidth, due in part, because there was no incentive to reduce the ad size

1   used for ads because it could directly pass costs for bandwidth and ad delivery content to

2   Plaintiff and Class Member's, without the Plaintiff and Class Member's from having any notice,

3   ie a Plaintiff and Class Member's playing a game application, and at the same time, Defendant

4   Application Developers and Defendant Application Affiliates were silently harvesting personal

5   data and sending it to remote servers using Plaintiff and Class Member's bandwidth.

6           172.    The Defendant's use of the Plaintiffs and Class Member's bandwidth for its data

7   mining activities is similar in nature to a practice called "hot linking"; wherein one(1) server

8   users another server and its bandwidth to send data. While it slows down the server, it also

9   allows bandwidth costs to be transferred to another server. Any redirect of a user's browsing

10  capabilities to access or download Defendant's and/or data mining activities produces similar

11  unauthorized bandwidth use. While only the tech savvy individuals are aware that their mobile

12  devices are used as a server without their knowledge or consent, fewer individuals are aware of

13  the extent that Application Developers and Application Developer Affiliates make "calls", to

14  third parties, and amount of user's bandwidth used when a user merely accesses a site:

15          "Let's look at what the popular twitterfon app does:

16              b.   App start

17              c.   Calls videoegg.adbureau.net, reports an iPhone is being used, sends

18                   UDID, app name & version.

19              d.   Calls met.adwhirl.com, sends app ID, iPhone UDID, county

20              e.   Calls twitter

21              f.   Calls pagead2.googlesyndication.com

22              g.   Calls beacon.pinchmedia.com, sends UDID, iPhone firmware, app ID &

23                   version, crack & jailbreak status, start & stop times

24              h.   App close"

25

26  Yobie Benjamin, "iBigBrother? IPhone privacy issues may interest FCC and FTC" (last accessed

27  January 25, 2011) online: http://www.sfgate.com/cgi-

28  bin/blogs/ybenjamin/detail?entry_id=46054

1    173.   The unauthorized Bandwidth use of the Plaintiffs and Class Member's mobile

2    devices was compounded by Apple's introduction of its push-notification system. Initially,

3    Apple iPhone SDK's restricted all code except that which relies on Apple's own programming

4    interference to run. This restriction limited Application Developers from running on the iPhone

5    "as is" due to its uses of scripting language inside the software. Such limitations would affect

6    game applications that use interpretive language in the background, moreover third party

7    software that depended on persistence to work and software that polls the rest of the system.

8    174.   With the advent of Apple's push-notification, the Defendant Application

9    Developer's and Defendant Application Affiliates could now conduct at will, their data mining

10   activities, in the "background" using Plaintiffs and Class member's bandwidth, without notice or

11   consent. Apple initially claimed that allowing "background activity" would be too much of a

12   drain on the handset's batteries and system resources, but once the push-notification system was

13   introduced Apple's concerns were apparently forgotten. Applications could now stay connected

14   to the apple server due to the persistent connection to the handset. This "background" connection

15   would automatically relay data from an application developer's server to apple, and in turn to the

16   iPhone application itself, allowing any program to continue to receive data, using in part, the

17   Plaintiffs and Class Member's bandwidth.

18   175.   Excluding the amount that the Plaintiffs and Class members use by their own

19   activities, the Defendant's unauthorized data mining activities caused substantial bandwidth use

20   to the Plaintiffs and Class Members resulting in actual out of pocket expenditures, for

21   Defendant's activities which include, but are not limited to the following:

22        a)   Transmittal of and access to Plaintiffs and Class Members UDID;

23        b)   Loading of Ads first before content, bundling ads, and ads with excessive

24             bandwidth;

25        c)   Use of SDK's, and its functions within Plaintiffs and Class Member's

26             mobile device;

27        d)   "Harvesting" of Plaintiffs and Class Member's mobile device data;

28        e)   "Background" Activities including "data mining".

**E.  <u>iPhone Application Developer License Agreement</u>**

176.    Application Developers that associate with Defendant Apple must initially complete an "Apple's iPhone Developer's Licensee Agreement" and agree to its terms which include the following:

> "You and the Application must comply with all applicable privacy and data collection laws and regulations with respect to any collection, transmission, maintenance, processing, use, etc. of the user's location data or personal information by the Application. In addition, the use of any personal information should be limited solely as necessary to provide services or functionality for Your Application (e.g., the use of collected personal information for telemarketing purposes is prohibited (unless expressly consented to by the user)). You and the Application must also take appropriate steps to protect any such location data or personal information from unauthorized disclosure or access."

177.    Application Developers must pay an initial fee and renewed fees per year, and agree to a revenue of 70% to the application developer and 30% to Apple on sold applications.

178.    Any application that a developer makes available to the Apple App store must first be approved by Apple; the UDID allows Apple to track the apps on the iOS devices and determine whether they are approved or not. A signed certificate is provided by Apple after the application has been "vetted." Due to the volume of new applications, and revenue earned by Apple for accepting new applications, the revenue process though has shortened dramatically during 2010.

179.    The entire family of devices built on the iPhone OS (iPhone, iPod Touch, iPad) have been designed to run only software that is approved by Apple—a major shift from the norms of the personal computer market. Apple designed the iPhone platform so as to control all software that was executed on the mobile device, thus the design did not allow full system (or root) access to users.

180.    Once an application is in compliance with Apple's licensing agreement, it is accepted, digitally signed, and made available through the iTunes App Store. Apple iTunes Store

1    users wanting to install applications on iOS must access the iTunes Store and initially agree to

2    licensing terms which include terms of use and a privacy policy.

3         181.    Apple warranted to its users that it would provide protection from malicious

4    applications and offered a "vetting" process to review each and every application before offering

5    such to its users. The process is secretive, cannot be confirmed, but Apple did not require all

6    apps to have privacy policies due to the volume of new applications, incentivized by the revenue

7    earned by Apple for accepting new applications, the revenue process has shortened dramatically

8    during 2010.

9         182.    The provisions in Apple's user agreement that prohibited data transmissions in

10   whole or part, and data sharing without a consumer's consent was not sufficient, due in part since

11   Apple failed to take steps to enforce these terms, nor terminated licensing agreements upon

12   Notice of Privacy Violations. Defendant's applications platforms and content

13   collection/distribution media-mobile Web sites, applications, did not follow establish policies,

14   and allowed transactions to occur that were in violation of Defendant Apple policies;

15   furthermore Defendant Apple allowed such violations to occur after provided notice of such

16   activities and Apple had the ability to terminate all entities that violated its policies:

17        •    "This Agreement shall terminate automatically upon Licensee's breach of any of

18   the terms of this Agreement. Apple may terminate this Agreement at will upon 10 days' written

19   notice."

20        183.    Defendant Apple, individually, and in concert with Defendant Application

21             Developers and Defendant Application Developer Affiliates violated the privacy

22             rights of Plaintiffs and Class Members; moreover such violations continue to date

23             although Defendant Apple has a "kill switch" to stop application which violate its

24             users' privacy, obtaining mobile device data, without authorization or consent and

25             fails to act:

26        •    "Steve Jobs, Apple's chief executive, has confirmed there is a 'kill switch' built

27   into the iPhone that allows Apple to remotely delete malicious or inappropriate applications

28   stored on the device. However, Mr. Jobs insisted that the so-called 'kill switch' was there as a

1   precaution, rather than a function that was routinely used. "Hopefully we never have to pull that

2   lever, but we would be irresponsible not to have a lever like that to pull," said Mr. Jobs."

3   Claudine Beaumont, "Apple's Jobs confirms iPhone 'kill switch'" (last accessed January 28,

4   2011) online: http://www.telegraph.co.uk/technology/3358134/Apples-Jobs-confirms-iPhone-

5   kill-switch.html

6       184.   Defendant Apple enabled the business practices, of Defendants, made the basis of

7   this action, by "relaxing" its privacy policy as it related to third party networks, since stringent

8   privacy policies to enforce its privacy policies threatened its revenues.

9       185.   Apple's Privacy Policy and representatives provided assurances to its users that

10  they were protected when they downloaded apps, and Plaintiffs and Class Members that

11  downloaded iTunes Apps, believed they had a general expectation of anonymity:

12       •      "Apple takes precautions- including administrative, technical, and physical

13  measures- to safeguard your personal information against loss, theft, and misuse, as well as

14  against unauthorized access, disclosure, alteration, and destruction."

15       •      "We have created strong privacy protections for our customers, especially

16  regarding location-based data," says Apple spokesman Tom Neumayr. "Privacy and trust are

17  vitally important."

18       186.   Tracking and monitoring of mobile device usage will have a negative effect on

19  individuals' access to information. The anonymity that the Internet affords individuals has made

20  it an incredible resource for those seeking out information. Particularly where the information

21  sought is on controversial topics such as sex, sexuality, or health issues such as HIV, depression,

22  and abortion; the ability to access information without risking identification has been critical. It

23  will result in increased pressure on individuals to permit the collection of the UDID, and other

24  information that can be tied to it, as a quid pro quo of engaging in transactions and interactions

25  online, placing a burden on individuals who choose to protect their privacy.

26  **F.  Apple 4.0 PLA, Section 3.3.9.**

27       187.   In January 2010 Defendant Flurry reported it had been tracking Defendant Apple

28  since October 2009, running an iPhone OS 3.2, revealing Defendant Apple's data about its new

1    products; moreover providing geo-location data of Defendant Apple's activity. Defendant Flurry

2    analytics tools were providing too much info to the point that they detected the iPad and its

3    characteristics before the actual announcement. Plaintiffs and Class Members did not, nor could

4    possibly have had, notice of the activities of the Defendant Application Developers and

5    Application Developers Affiliates' activities, made the basis of this action, verified in whole or

6    part, by the inability of Apple to keep their device specifics protected when it failed to detect that

7    Flurry had been scanning its online actions.

8        188.   Defendant Apple's CEO, Steve Jobs was outrage and voiced his concerns related

9    to Defendant Flurry obtaining mobile device data, without authorization. The ability of

10   Defendant Flurry analytics being able to covertly obtain such data from Defendant Apple

11   without Defendant Apple having notice provides insight as to similar outrage and concern from

12   Plaintiffs' and Class Members' for the identical acts, made the basis of this action:

> ""It's violating every rule in our privacy policy," Jobs boomed. "We went through
> the roof about this. So we said: No, we're not going to allow this. It's violating
> our privacy policies and its pissing us off that they're publishing data about our
> new products."
>
> "So we said we are only going to allow these analytics that don't give device
> information and therefore are solely for the purpose of advertising," Jobs said.
> "We're not going to be the only advertiser. There's others, and we're not banning
> other advertisers from our platforms."
>
> "They can do that. But they can't send data out to an analytics firm who is going
> to sell it to make money and publish it to tell everybody that we have devices on
> our campus that we don't want people to know about. That," Jobs said, "we don't
> need to do."
>
> Jobs acknowledged that there are legitimate uses of data analysis by app
> developers, if users are appropriately appraised of the fact that their data is being
> shared. "After we calm down, we're willing to talk to some of these analytics
> firms," Jobs said. "But it's not today.'"

Daniel Eran Dilger, "Jobs: iPhone ad SDK changes for user privacy, not anti-competitive" (last
accessed January 28, 2011), online:
http://www.appleinsider.com/articles/10/06/02/jobs_iphone_ad_sdk_changes_for_user_privacy_
not_anti_competitive.html

         189.   From January 2010 until April 2010, Defendant Apple failed to provide notice to

1  Plaintiffs and Class Members of the activities of iPhone applications and affiliated ad networks

2  and/or web analytics vendors obtaining mobile device data, nor take appropriate action to cure

3  this security flaw; including but not limited to changing its privacy policy and licensing

4  agreements with any and all associated entities.

5      190.  From July 2008 until April 2010, Defendant Apple provided no notice to

6  Plaintiffs and Class Members of Defendant Application Developer's Affiliates obtaining mobile

7  device data, such as their UDID and using such as a user's identifier of their mobile device data.

8      191.  In April 2010 Defendant Apple changed its policy related to the collection of

9  mobile device data, aggregation of user data, and its use for web analytics:

10      192.  Defendant Apple waited until June 21, 2010 to change its users' privacy policy.

11  Notice of such was provided only to those that attempted to update their apps via iTunes when a

12  page indicating Apple had changed its privacy policy, without specific reasons for any changes

13  non citation of specific changes. Users were notified only to the following:

iTunes Store Terms and Conditions have changed. Apple's
14  Privacy Policy

15  The changes we have made to the terms and conditions include the following:
   • Apple's Privacy Policy has changed in material ways. Please visit www.apple.com/legal/
16  privacy or view below.

17  "iAd Privacy Policy," (last accessed February 3, 2011), online:
   http://useyourloaf.com/blog/2010/6/21/iad-privacy-policy.html
18

19      193.  Defendant Apple's privacy policy failed to provide notice of Defendants'

20  Application Developer's Affiliates actions related to UDIDs and provided an opt out mechanism

21  that related only to Apple, and to opting out of Apple's iAds only:

22      •   "Apple and its partners use cookies and other technologies in mobile advertising

23  services to control the number of times you see a given ad, deliver ads that relate to your

24  interests, and measure the effectiveness of ad campaigns. If you do not want to receive ads with

25  this level of relevance on your mobile device, you can opt out by accessing the following link on

26  your device: http://oo.apple.com. If you opt out, you will continue to receive the same number of

27  mobile ads, but they may be less relevant because they will not be based on your interests. You

28  may still see ads related to the content on a web page or in an application or based on other non-

1  personal information. This opt-out applies only to Apple advertising services and does not affect

2  interest-based advertising from other advertising networks."

3  194.  In May 2010, Defendant Flurry attempted to appease Defendant Apple and

4  released a new version of its SDK, citing its "privacy first initiation," in an effort to comply with

5  Defendant Apple's new policy related to use of mobile device data, such as UDIDs.

6  •  "On the issue of device data," Farago explains, "we are updating our analytics

7  service to comply with section 3.3.9 of the Apple 4.0 PLA. We will not collect device data."

8  "Flurry: As Concerned About Privacy As Apple," online:

9  http://www.wirelessweek.com/News/2010/06/Policy-and-Industry-Flurry-Privacy-Apple-Safety-

10  and-Security/

11  195.  Defendant Flurry attempt through to revise its prior business activities by issuance

12  of its new policy actually provides insight, and confirmation of, its past data collection practices

13  by use of Plaintiffs and Class Members' mobile device data, including their UDIDs:

14  •  Defendant Flurry would now offer an opt-out switch for tracking. Many iTunes

15  applications do not have a privacy policy nor provide notice of any association with Defendant

16  Application Developer Affiliates, including Defendant Flurry, for users to be able to opt-out.

17  •  Defendant Flurry would now provide the opt-out mechanism so users could delete

18  user data directly linked to a specific device. Defendant Flurry obtains data from 30-40,000 apps,

19  the cross application aggregation of user data linked specifically to a mobile devices' UDID

20  provided substantial tracking data which Defendant Flurry continues to possess as noted,

21  Plaintiffs and Class Members will have no notice of Defendant Application Developer Affiliates

22  association with their applications, including Defendant Flurry.

23  •  Defendant Flurry would now no longer obtain geographic data that was granular

24  enough to place a mobile device within close proximity to the user.

25  **G.  Defendants' Harmful Business Practices**

26  196.  Defendants' business practice unfairly wrests control from Plaintiffs and Class

27  Members who choose to block and delete any mobile tracking device on their mobile devices in

28  order to avoid being tracked. Plaintiffs and Class Members who are aware of being tracked may

1   attempt to delete any and all tracking devices periodically, believing that the new applications

2   they receive will not contain new unique identifiers, thus hindering the ability of advertising

3   networks to track their behavior across sites; however such shall be using a false theory. Using

4   databases overrides this attempt, with little available redress for users.

5        197.   Defendants failed to disclose that its applied technologies, such as UDIDs provide

6   Defendants with the ability to surreptitiously intercept, access, and collect electronic

7   communications and information from unsuspecting Plaintiffs and the Class Members, obtaining

8   personal and private information, monitor their Internet activity, and create detailed personal

9   profiles based on such information.

10       198.   Defendants intercepted Class Members' electronic communications for the

11   purpose of committing a tortious or criminal act, and violated the constitutional rights of

12   Plaintiffs and Class Members.

13       199.   In all cases where some notice was provided, that notice was insufficient,

14   misleading, and inadequate. Consent under such circumstances was impossible.

15       200.   Defendants failed to provide opt-out functionality for Plaintiffs and Class

16   Members, so that Plaintiffs and Class Members could set their security preferences.

17       201.   Apple failed to implement a software program that would scramble the UDID,

18   creating a unique ID for each application.

19       202.   In any case where the opportunity of 'opting out' of the Defendants service was

20   provided, such 'opt-out' rights were misleading, untrue, and deceptive.

21       203.   In no case was the collection of all Internet communication data between the

22   consumer and the Internet halted or affected in any way. All data was still collected. The 'opt-

23   out' only affected what advertisements the consumer was shown. Thus, the provision of the

24   opportunity for opting-out was, itself, totally misleading.

25       204.   Plaintiffs and the Class Members did not voluntarily disclose their personal and

26   private information to the Defendants' tracking, let alone their including their mobile device

27   surfing habits, to Defendants - and indeed never even knew that Defendant Application

28   developers Affiliates existed or conducted data collection and monitoring activities upon and

across its Plaintiffs' and Class Members' applications. Plaintiffs and the Class Members provided such information, and had their Internet habits monitored, without their knowledge or consent, and would not have consented having their personal and private information, including their on-line profiles, used for Defendants' commercial gain.

205.    Defendants did not obtain consent from Plaintiffs and Class Members for any collection or use of any and all data derived in whole or part from use of a UDID and was not allowed to decline consent at the time such statement was presented to the Class Members.

206.    Defendants did not obtain consent from Plaintiffs and Class Members for any disclosure of covered information to unaffiliated parties and was not allowed to decline consent at the time such statement was presented to the Class Members.

207.    Defendants intentionally accessed data, derived in whole part, from Plaintiffs' and Class Members' mobile devices without authorization or exceeded authorized access to obtain information from a protected mobile devices, involved in interstate communications.

208.    Defendants sold, shared, and/or otherwise disclosed covered information of Class Members to an unaffiliated party without first obtaining the consent of the Class Members to whom the covered information related to.

209.    At all relevant times, Plaintiffs' and Class Members' personal and private information was electronically intercepted by and/or accessed by Defendants and transmitted to it on a regular basis, without alerting Plaintiffs and Class Members in any manner. As a result, Defendants was able to and did obtain data derived in whole or part from Plaintiffs' and Class Members' mobile devices and/or intercept their electronic communications without authorization. Defendants have obtained, compiled, and used this personal information for its own commercial purposes.

210.    Defendants intercepted Plaintiffs' and Class Members' electronic communications for the purposes of obtaining mobile device data, using a UDID from Plaintiffs' and Class Members' mobile devices; repeatedly accessing electronic communications without Plaintiffs ' and Class Members' knowledge and consent so as to profile such persons' web browsing habits, secretly tracking Plaintiffs' and Class Members' activities on the Internet and

1    collecting personal information about consumers; and profiting from the use of the illegally

2    obtained information, all to Defendants' benefit and Plaintiffs' and Class Members' detriment.

3        211.   Defendants intentionally intercepted, endeavored to intercept, or procured another

4    entity to intercept or endeavor to intercept the electronic communication of Plaintiffs and Class

5    Members.

6        212.   Defendants have, either directly or by aiding, abetting and/or conspiring to do so,

7    knowingly, recklessly, or negligently disclosed, exploited, misappropriated and/or engaged in

8    widespread commercial usage of Plaintiffs' and the Class Members' mobile device data,

9    obtaining private and sensitive information for Defendants' own benefit from unauthorized use

10    of their UDID, without Plaintiffs' or the Class Members' knowledge, authorization, or consent.

11    Such conduct constitutes a highly offensive and dangerous invasion of Plaintiffs' and the Class

12    Members' privacy.

13        213.   Defendants used and consumed the resources of the Plaintiffs' and Class

14    Members' mobile devices by gathering user information, adding such information to their mobile

15    database, and transferring such to Defendants.

16        214.   Defendants caused harm and damages to Plaintiffs' and Class Members' mobile

17    devices finite resources, depleted and exhausted its memory, thus causing an actual inability to

18    use it for its intended purposes, and significant unwanted CPU activity, usage, and network

19    traffic, resulting in instability issues.

20        215.   Defendants caused harm and damages to the Plaintiffs and Class Members

21    including but not limited to, consumption of their device's finite resources, memory depletion,

22    and bandwidth, which resulted in the actual inability to use if for its intended purposes.

23        216.   Defendants' activity was not evident. Plaintiffs and Class Members assumed that

24    the issues related to hardware, Windows installation problems, or viruses, and resorted to

25    contacting technical support experts, or even buying a new mobile device because the existing

26    system mobile device posed privacy risks.

27        217.   Defendants harmed Plaintiffs and Class Members by its actions which included,

28    but not limited to the following:

1          a)  Loss of valuable data by attempts to remove UDIDs and databases once

2              discovered;

3          b)  Incurred economic losses accompanied by an interruption in service;

4          c)  Functionality of mobile device was interfered with, including an inability of

5              applications visited once content was disabled;

6          d)  Information was deleted, otherwise made unavailable;

7          e)  Impaired the integrity and availability of data, programs and information.

8          f)   Mobile device bandwidth;

9          g)  Inability to resell the user's iPhone with a UDID associated with user's

10              aggregate mobile device data.

11      218.   Defendants impacted upon the Plaintiffs and Class Members ability to sell their

12  mobile devices since the mobile device's UDID will have aggregated data linked to such device

13  and be provided aggregated cross platform data. The new mobile device owner will then be

14  provided tracking advertisements related to the past mobile device owner.

15      219.   Plaintiffs and Class Members were personally injured, as that term is recognized

16  within the cyber and technology industry, when Defendants intentionally, or in the alternative,

17  negligently, obtained, processed, and disseminated content, obtained without authorization,

18  invading Plaintiffs' and Class Members' right of privacy, which portrayed Plaintiffs and Class

19  Members in a false light by publicly disclosing private facts by their intrusion upon seclusion of

20  Plaintiffs' and Class Members' personal mobile browsing activity.

21      220.   Defendants' impact upon the Plaintiffs' and Class Members' mobile devices was

22  significant and a substantial reduction in available memory, processing power and database

23  storage.

24      221.   Defendants' interaction with the Plaintiffs' and Class Members' mobile device

25  was not temporarily, but a permanent use of the mobile devices' storage resulting in a significant

26  loss of use and potentially overwhelming the Plaintiffs' and Class Members' databases.

27      222.   Plaintiffs and Class Members expended money, time, and resources investigating

28  and attempting to mitigate their mobile devices diminished performance, in addition to

1   investigating and attempting to remove the Defendants' tracking mechanisms.

2       223.   Plaintiffs and Class Members conducted a damage assessment once they became

3   aware of Defendants' practices, made the basis of this action, attempting to restore any affected

4   data, program, system or information.

5       224.   Defendants' conduct caused outrage, mental suffering, harm, and humiliation to

6   Plaintiffs' and Class Members' privacy expectations.

7       225.   Defendants intentionally disposed of the Plaintiffs' and Class Members' property

8   by using and intermeddling with their mobile devices so as to compare its condition, quality, and

9   value, disposing the Plaintiffs and Class Members of the use of their mobile devices for a

10  substantial time.

11      226.   Defendants' Unique Device Identifier, remains identified with the Plaintiffs' and

12  Class Members' devices, thus the value of the device has been diminished, or now has no value

13  for resale.

14      227.   Defendants' activities occurred throughout the United States, and have secretly

15  obtained personal and private information from Plaintiffs and the Class Members - a course of

16  action and a body of information that is protected from interception, access, and disclosure by

17  federal law.

18      228.   Defendants used, interfered with, and intermeddled with Class Members'

19  ownership of their personal property, namely, their mobile devices, by, directly or indirectly,

20  secretly obtaining Plaintiffs' and Class Members' data derived from their UDID, secretly

21  accessing their mobile devices to obtain information contained in and enabled by the Unique

22  Device Identifier, and secretly collecting personal data and information regarding each Plaintiffs'

23  and Class Members' Internet surfing habits contained in electronic storage on his/her mobile

24  device.

25      229.   Defendant Apple failed to disclose that its UDID software is used to track and

26  store information regarding consumers' Internet use and other forms of advertisements on

27  consumers' mobile devices based on such use. The installation of such tracking device would be

28  material to consumers in their decision whether to install the software offered by Defendant

1   Apple. Defendant's furthered their deceitful practices by storing the tracking files in locations on

2   consumers' mobile device that is rarely accessed by consumers.

3       230.   Defendants' technology wrongfully monitored Internet users' activities at each

4   and every website users visited and the wrongfulness of this conduct is multiplied by the fact that

5   Defendants aggregates this information about users' habits across numerous applications and

6   unjustly enriched Defendants to the severe detriment of Plaintiffs and the Class Members.

7   Plaintiffs and the Class Members have been harmed, as they have been subjected to repeated and

8   unauthorized invasions of their privacy - violations which continue to this day.

9       231.   Without remedy, Plaintiffs and Class Members will continue to be tracked by

10   dozens of companies — companies they've never heard of, companies they have no relationship

11   with, companies they would never choose to trust with their most private thoughts and reading

12   habits.

13       232.   Defendants' privacy documents, which include, but are not limited to, its privacy

14   policy and terms of use, intentionally, or in the alternative, negligently, omit notice of any and all

15   of its activities made the basis of this action. Such omissions relate in whole or part, to

16   Defendant's intentional, or in the alternative, negligent, omission within its privacy documents to

17   any and all activities related to the basis of this action and notice of its activities with each

18   Affiliate.

19       233.   Defendants' privacy documents fail to provide adequate notice that third parties,

20   made the basis of this action would be allowed access to personal behavioral data of their users,

21   including but not limited to, such data embedded with their applications, which in turn shares the

22   data with its marketing partners or corporate affiliates and subsidiaries, meaning that user

23   behavior will be profiled by any other entities with whom those sites may choose to share this

24   information. While Defendants' privacy documents state they do not share data with third

25   parties, but they do share data with affiliates, suggesting that they only share data with

26   companies under the same corporate ownership.

27       234.   Defendant's privacy documents referenced the use of analytics, but state such is

28   used only for audience measurement and not behavioral ad-targeting.

235.   Defendant Apple's privacy documents do not expressly state that if a user opts-out that behavioral information will not be collected and shared, but only that the user will not receive Internet based advertising content.

236.   Defendant's privacy documents falsely imply some level of protection for the user. Defendants' privacy documents are sufficiently vague so as to refrain from fully disclosing information to their users about what information is collected through their applications and their associated entities, how the information is used, and the purposes for the collection and use of this information, negating the possibility for their users to provide informed and meaningful consent to these practices. Without adequate notice and informed and meaningful user consent, users had no control over their personal information, thus, the potential privacy dangers were not readily apparent to most users.

237.   Defendant's privacy documents require college-level reading skills for comprehension and include substantial legalese, ambiguous and obfuscated language designed to confuse, disenfranchise, and mislead the users.

238.   Defendant's privacy documents incorporate a multitude of hedging and modality markers so as to minimize their use of covert surveillance technology and data-gathering tools, while sending mixed messages related to privacy controls, advising users that choosing to exercise such controls would cause in whole, or part, diminished functionality of their applications.

239.   Defendant's privacy documents describe "associations," misleading the users which interpret such to be associated corporate subsidiaries, withholding accurate information that such includes other entities than advertising networks, such as: advertising networks, data exchanges, traffic measurement service providers, marketing and analytic service providers.

240.   Defendants' applications, and its tracking services, are owned by parent companies that have many subsidiaries and fail to provide adequate information about third-party information sharing, different than affiliate sharing, which is subject to more restrictions, including opt-in or opt-out consent requirements. These restrictions are based upon the heightened risk associated with sharing information with unrelated entities, which have different

1    incentives than the entity that collected the user data.

2         241.   Defendants do not make adequate distinctions between sharing with affiliates,

3    contractors, and third parties, instead, vaguely stating that they do not share user data with

4    unrelated third parties and vaguely disclosing that they share data with affiliates. Users must

5    interpret an affiliate to be a third party, but given the actual usage of these terms of Affiliates'

6    privacy policies, that assumption would be mistaken.

7         242.   Defendant do not users are unable to identify the corporate families to which its

8    applications belong, since they provide no privacy documents, which makes it difficult for a user

9    to discover exactly who such associated entities are, thus their practices are deceptive. A practice

10   is deceptive if it involves a representation, omission or practice that is likely to mislead a

11   consumer acting reasonably in the circumstances, to the consumer's detriment. The conflicting

12   statements in the privacy policies would most likely confuse or mislead a reasonable consumer.

13   The confusion would also likely be to their detriment, as surveys indicate that users do not want

14   companies to collect data about them without permission.

15        243.   Defendant's privacy documents discuss that the data collection practices of

16   entities associated with their corporations are outside the coverage of their privacy policies. This

17   appears to be an attempt to create a critical loophole compounding their attempts to violate the

18   privacy protection of their users.

19        244.   Defendant's privacy documents fail to adhere to an adequate notice and choice

20   regime, predicated on user choice, and informed by privacy policies. Defendant's privacy

21   documents provided nuanced situations that created conditional yes or no answers to these basic

22   questions about a site's data collection and sharing practices, thus it is unclear how an average

23   user could ever understand these practices since the nuances were not explained in the privacy

24   policy. Choice, therefore, cannot be inferred.

25        245.   Defendant Apple's privacy documents carefully attempt to parse the definitions of

26   phrases related to their tracking activity. Their privacy documents are more nuanced than such

27   categorized analysis allows for, embedding any and all purposes for its use of surveillance

28   technology into the user's mobile device hardware, use of user's mobile device hardware to store

1   data, use of technology to allow the perpetual mobile device tracking and surveillance of any and

2   all mobile device Internet activity of the Defendant Apple users as evidenced by the attempt of

3   Defendant Apple to hide its covert activity by referring to their use of "other technologies," or

4   "similar technologies" than UDID tracking which would have perpetual existence on a user's

5   mobile device.

6       246.    Defendant's privacy documents fail to provide notice that their data storage

7   practices as they relate to the period for which user data is stored, have no term period, and are

8   indefinite.

9       247.    Defendant's privacy documents' verbiage was deceptive by design. This

10  deception is especially troubling when compared with the obligation imposed upon their mobile

11  device visitors to download, read, and comprehend the vast amount of documents required to

12  protect one's mobile device privacy, complicated by the cumulative effect of such task.

13      248.    In addition to downloading, reading and comprehending all of Defendant Apple's

14  and Defendant Application Developers privacy documents, its users would be required to locate

15  and attempt to do the same for Defendant Application Developers Affiliates. To accentuate the

16  improbability of completing this task though, Plaintiff and Class Members were not provided

17  information of the identity of Defendant Application Developer's Affiliates, nor its association

18  with Apple.

19      249.    Defendant Application Developer Affiliates privacy documents, reveal omissions

20  related to in whole or part, intentionally, or in the alternative negligently, omitting within the

21  Defendant Application Developers Affiliate privacy documents to any and all activities related to

22  the basis of this action and notice of its activities with Defendant Application Developers.

23      250.    Defendants mobile device privacy protection was premised upon imposed

24  requirement to download, read, and comprehend the accumulation of all privacy documents of

25  all Defendants.

26      251.    A millisecond was the time allotted for the Plaintiffs and Class Members

27  downloading a Defendant Apple iTunes Store application, before Defendant Application

28  Developers and Defendant Application Developer Affiliates intentionally, and without user's

1  authorization and consent, had Defendant Apple transmit, and/or allowed access to, data related

2  to whole or part, from the Plaintiffs' and Class Members' UDID. Such occurred without the

3  benefit of being advised of the association between Defendant Application Developer and its

4  Application Developer Affiliate, provided adequate time to access, read, and comprehend the

5  Terms of Service/Use and Privacy Policy for all Defendants which had privacy policies. While

6  only the most technical savvy mobile device users were familiar with UDIDs, a finite amount of

7  individuals even knew about "UDID," let alone could possibly comprehend the technical aspects

8  inherent within the Defendants' privacy documents.

9

> Defendants sought a virtual "Forbidden Fruit", and it was Apple's UDID:
> *"But of the fruit of the tree which is in the midst of the garden, God hath said, Ye shall not eat of it, neither shall ye touch it, lest ye die"*
> *Genesis 3:3*

10

11

12
## CLASS ALLEGATIONS
### Allegations as to Class Certification

13

14  252.   Pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3),

15  Plaintiffs bring this action as a Class action, on behalf of themselves and all others similarly

16  situated as members of the following Classes (collectively, the "Class"):

17  a)U.S. Resident Class: All persons residing in the United States who have downloaded

18  and used one of the Defendants' apps on their iPhone, iPad, or iTouch from July 10, 2008

19  to the date of the filing of this complaint.

20  b)Injunctive Class: All persons after the date of the filing of this complaint, residing in

21  the United States, who have downloaded and used one of the Defendants' apps on their

22  iPhone, iPad, or iTouch after the date of the filing of this complaint.

23

24  253.   The Class action period, (the "Class Period"), pertains to the dates, July 10, 2008

25  to the date of Class certification.

26  254.   Plaintiffs reserve the right to revise this definition of the Class based on facts

27  learned in the course of litigation of this matter.

28  255.   On behalf of the U.S. Resident Class,  Plaintiffs seek equitable relief, damages

1 and injunctive relief pursuant to:

    a)  Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

    b)  Electronic Communications Privacy Act, 18 U.S.C. § 2510;

    c)  California's Computer Crime Law, Penal Code § 502;

    d)  California's Invasion of Privacy Act, Penal Code § 630;

    e)  Consumer Legal Remedies Act, ("CLRA") California Civil Code § 1750;

    f)  Unfair Competition, California Business and Professions Code § 17200;

    g)  Breach of Contract;

    h)  Conversion;

    i)  Trespass to Personal Property / Chattels; and

    j)  Unjust Enrichment

256.  On behalf of the Injunctive Class, Plaintiffs seek only injunctive relief.

257.  **Persons Excluded From Classes:** Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

258.  Plaintiffs reserve the right to revise these Class definitions of the Classes based on facts they learn during discovery.

259.  **Numerosity:** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of members. The precise number of Class Members is unknown to Plaintiffs. The true number of Class Members is known by Defendants, however and, thus, Class Members may be notified of the pendency of this action by first Class mail, electronic mail, and by published notice. Upon information and belief, Class Members can be

1    identified by the electronic records of Defendants.

2        260.   **Class Commonality:**  Pursuant to Federal Rules of Civil Procedure, Rule

3    23(a)(2) and Rule *23(b)(3)*, are satisfied because there are questions of law and fact common to

4    Plaintiffs and the Class, which common questions predominate over any individual questions

5    affecting only individual members, the common questions of law and factual questions include,

6    but are not limited to:

> a)   What was the extent of Defendants' business practice of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs") and how did it work?
>
> b)   What information did Defendants collect from its business practices of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs"), and what did it do with that information?
>
> c)   Whether users, by virtue of their downloading the application, had pre-consented to the operation of Defendant's business practices of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs");
>
> d)   Was there adequate notice, or *any* notice, of the operation of Defendants' business practices of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs") provided to Plaintiffs and Class Members?
>
> e)   Was there reasonable opportunity to decline the operation of Defendants' business practices of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs") provided to Plaintiffs and Class Members?
>
> f)   Did Defendant's and business practices of obtaining, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs") disclose, intercept, and transmit personally identifying information, or sensitive identifying information, or personal information?
>
> g)   Whether Defendants' devised and deployed a scheme or artifice to defraud or conceal from Plaintiffs and the Class Members Defendants' ability to, and practice of, intercepting, accessing, and manipulating, for its own benefit, personal information, and tracking data from Plaintiffs' and the Class' personal  mobile device via the ability to; track their mobile device by tracking its UDID on their mobile device;
>
> h)   Whether Defendants engaged in deceptive acts and practices in, connection with its undisclosed and systemic practice of transmitting, accessing and/or disclosing unique identifiers, tracking data, and personal information on Plaintiffs' and the Class' personal mobile device and using that data to track and profile Plaintiffs' and the Class Member's Internet activities and personal habits, proclivities, tendencies, and preferences for Defendants' use and

benefit;

i)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, and remotely storing user's Unique Device Identifiers ("UDIDs") violate the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030?

j)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") violate the Electronic Communications Privacy Act, 18 U.S.C. § 2510?

k)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") violate the Violations of California's Computer Crime Law, Penal Code § 502;

l)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") violate the Violations of the California Invasion of Privacy Act, Penal Code § 630;

m)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") violate the Violations of the Consumer Legal Remedies Act, ("CLRA") California Civil Code § 1750;

n)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") violate the Violation of Unfair Competition, California Business and Professions Code § 17200;

o)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") involve a Breach of Contract;

p)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") involve a Conversion:

q)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") involve a Trespass to Personal Property / Chattels;

r)   Did the implementation of Defendants' business practices of transmitting, accessing, collecting, monitoring, remotely storing user's Unique Device Identifiers ("UDIDs") result in Unjust Enrichment:

s)   Are any of the Defendants liable under a theory of aiding and abetting one (1) more of the remaining Defendants for violations of the statutes listed herein?

t)   Are the Defendants' liable under a theory of civil conspiracy for violations of the statutes listed herein?

u)   Are the Defendants' liable under a theory of unjust enrichment for violations of the statutes listed herein?

v) Whether Defendants' participated in and/or committed or is responsible for violation of law(s) complained of herein;

w) Are Class Members entitled to damages as a result of the implementation of Defendants' marketing scheme, and, if so, what is the measure of those damages?

x) Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages;

y) Whether Plaintiffs and members of the Class are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

z) Whether Plaintiffs and members of the Class are entitled to punitive damages, and, if so, in what amount?

261. **Typicality:** Plaintiff's claims are typical of the claims of all of the other members of the Class, because his claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendants.

262. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel highly experienced in complex consumer Class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

263. **Superiority:** A Class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the Class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

264. In the alternative, the Class may be also certified because:

    a) the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for the Defendants;

    b) the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c) Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

265. The claims asserted herein are applicable to all persons throughout the United States that meet the class definition & class period.

266. The claims asserted herein are based on Federal law and California law, which is applicable to all Class Members throughout the United States.

267. Adequate notice can be given to Class Members directly using information maintained in Defendants' records or through notice by publication.

268. Damages may be calculated from the information maintained in Defendants' records, so that the cost of administering a recovery for the Class can be minimized. The amount of damages is known with precision from Defendants' records.

### First Cause of Action
### Violation of the Computer Fraud and Abuse Act
### 18 U.S.C. § 1030 *et seq.*

269. Plaintiffs incorporate by reference all paragraphs previously alleged herein.

270. Plaintiffs assert this claim against each and every Defendant named herein in this complaint on behalf of themselves and the Class.

271. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, referred to as "CFAA," regulates fraud and relates activity in connection with computers, and makes it unlawful to intentionally access a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, thereby obtaining

1   information from such a protected computer, within the meaning of U.S.C. § 1030(a)(2)(C).

2       272.   Defendants violated 18 U.S.C. § 1030 by intentionally accessing Plaintiffs' and

3   Class Members' mobile computing device, without authorization by exceeding access, thereby

4   obtaining information from such a protected device.

5       273.   At all relevant times, Defendants engaged in business practices of transmitting

6   code from within the Plaintiffs' and Class Members' downloaded iPhone Applications so as to

7   access their mobile devices to obtain a UDID and mobile device data. Such acts were conducted

8   without authorization and consent of the Plaintiffs and Class Members.

9       274.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), provides a civil cause

10  of action to "any person who suffers damage or loss by reason of a violation" of CFAA.

11      275.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i), makes it

12  unlawful to "knowingly cause[s] the transmission of a program, information, code, or command

13  and as a result of such conduct, intentionally cause[s] damage without authorization, to a

14  protected computer," of a loss to one or more persons during any one-year period aggregating at

15  least $5,000 in value.

16      276.   Plaintiffs' computer is a "protected computer...which is used in interstate

17  commerce and/or communication" within the meaning of 18 U.S.C. § 1030(e)(2)(B).

18      277.   Defendants violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing a

19  Plaintiffs' mobile computing device, without authorization or by exceeding access, thereby

20  obtaining information from such a protected mobile computing device.

21      278.   Defendants violated 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the

22  transmission of a command embedded within their webpage's, downloaded to Plaintiffs' mobile

23  computing device, which are protected mobile computing devices as defined in 18 U.S.C. §

24  1030(e)(2)(B). By accessing, collecting, and transmitting Plaintiffs' viewing habits, Defendants

25  intentionally caused damage without authorization to those Plaintiffs' mobile computing devices

26  by impairing the integrity of the computer.

27      279.   Defendants violated 18 U.S.C. § 1030(a)(5)(A)(ii) by intentionally accessing

28  Plaintiffs' and Class Members' protected mobile computing devices without authorization, and

1    as a result of such conduct, recklessly caused damage to Plaintiffs' and Class Members' mobile

2    computing devices by impairing the integrity of data and/or system and/or information.

3        280.    Defendants violated 18 U.S.C. § 1030(a)(5)(A)(iii) by intentionally accessing

4    Plaintiffs' and Class Members' protected mobile computing devices without authorization, and

5    as a result of such conduct, caused damage  and loss to Plaintiffs and Class Members.

6        281.    Plaintiffs have suffered damage by reason of these violations, as defined in 18

7    U.S.C. § 1030(e)(8), by the "impairment to the integrity or availability of data, a program, a

8    system or information."

9        282.    Plaintiffs have suffered loss by reason of these violations, as defined in 18 U.S.C.

10   § 1030(e)(11), by the "reasonable cost ... including the cost of responding to an offense,

11   conducting a damage assessment, and restoring the data, program, system, or information to its

12   condition prior to the offense, and any revenue lost, cost incurred, or other consequential

13   damages incurred because of interruption of service."

14       283.    Plaintiffs have suffered loss by reason of these violations, including, without

15   limitation, violation of the right of privacy, disclosure of personal identifying information,

16   sensitive identifying information, and personal information, interception, and transactional

17   information that otherwise is private, confidential, and not of public record.

18       284.    As a result of these takings, Defendants' conduct has caused a loss to one or more

19   persons during any one-year period aggregating at least $5,000 in value in real economic

20   damages.

21       285.    Plaintiffs and Class Members have additionally suffered loss by reason of these

22   violations, including, without limitation, violation of the right of privacy.

23       286.    Defendants' unlawful access to Plaintiffs' computers and electronic

24   communications has caused Plaintiffs irreparable injury.  Unless restrained and enjoined,

25   Defendants will continue to commit such acts.  Plaintiffs' remedy at law is not adequate to

26   compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including

27   injunctive relief as provided by 18 U.S.C.  § 1030(g).

28

**Second Cause of Action**
**Violations of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510**

287. Plaintiffs incorporate by reference all paragraphs previously alleged herein.

288. Plaintiffs assert this claim against each and every Defendant named herein in this complaint on behalf of themselves and the Class.

289. The Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, referred to as "ECPA," regulates wire and electronic communications interception and interception of oral communications, and makes it unlawful for a person to "willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," within the meaning of 18 U.S.C. § 2511(1).

290. Defendants violated 18 U.S.C. § 2511 by intentionally acquiring and/or intercepting, by device or otherwise, Plaintiffs' and Class Members' electronic communications, without knowledge, consent, or authorization.

291. At all relevant times, Defendants engaged in business practices of intercepting the Plaintiffs' and Class Members' electronic communications which included endeavoring to intercept the transmission of a UDID from within their mobile device. Once the Defendants obtained the UDID they used such to aggregate mobile device data of the Plaintiffs and Class Members as they used their mobile device, browsed the Internet, and activated downloaded iPhone applications.

292. The contents of data transmissions from and to Plaintiffs' and Class Members' personal computers constitute "electronic communications" within the meaning of 18 U.S.C. §2510.

293. Plaintiffs are "person[s] whose … electronic communication is intercepted … or intentionally used in violation of this chapter" within the meaning of 18 U.S.C. § 2520.

294. Defendants violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept Plaintiffs' electronic communications.

295. Defendants violated 18 U.S.C. § 2511(1)(c) by intentionally disclosing, or endeavoring to disclose, to any other person the contents of Plaintiffs' electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiffs' electronic communications.

296. Defendants violated 18 U.S.C. § 2511(1)(d) by intentionally using, or endeavoring to use, the contents of Plaintiffs' electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiffs' electronic communications.

297. Defendants' intentional interception of these electronic communications without Plaintiffs' or Class Members' knowledge, consent, or authorization was undertaken without a facially valid court order or certification.

298. Defendants intentionally used such electronic communications, with knowledge, or having reason to know, that the electronic communications were obtained through interception, for an unlawful purpose.

299. Defendants unlawfully accessed and used, and voluntarily disclosed, the contents of the intercepted communications to enhance their profitability and revenue through advertising. This disclosure was not necessary for the operation of Defendants' system or to protect Defendants' rights or property.

300. The Electronic Communications Privacy Act of 1986, 18 USC §2520(a) provides a civil cause of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used" in violation of the ECPA.

301. Defendants are liable directly and/or vicariously for this cause of action. Plaintiffs therefore seek remedy as provided for by 18 U.S.C. §2520, including such preliminary and other equitable or declaratory relief as may be appropriate, damages consistent with subsection (c) of that section to be proven at trial, punitive damages to be proven at trial, and a reasonable attorney's fee and other litigation costs reasonably incurred.

302. Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

303. Plaintiffs and the Class, pursuant to 18 U.S.C. §2520, are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations. Unless restrained and enjoined, Defendants will continue to commit such acts. Plaintiffs' remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiffs to remedies including injunctive relief as provided by 18 U.S.C. § 2510.

### Third Cause of Action
### Violation of California's Computer Crime Law
### Penal Code § 502 *et seq.*

304. Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

305. The California Computer Crime Law, California Penal Code § 502, referred to as "CCCL" regulates "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems."

306. Defendants violated California Penal Code § 502 by knowingly accessing, copying, using, made use of, interfering, and/or altering, data belonging to Plaintiffs and Class members: (1) in and from the State of California; (2) in the home states of the Plaintiffs; and (3) in the state in which the servers that provided the communication link between Plaintiffs and the applications they interacted with were located.

307. At all relevant times, Defendants business practices of accessing the Plaintiffs' and Class Members' mobile devices initially in order to obtain their UDID, then on a systematic and continuous basis, Defendants accessed the Plaintiffs' and Class Members' mobile devices in order to obtain mobile device data and to monitor and collect data related to their browsing habits.

308. Pursuant to California Penal Code § 502(b)(1), "Access means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network."

309.   Pursuant to California Penal Code § 502(b)(6), "Data means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device."

310.   Defendants have violated California Penal Code § 502(c)(1) by knowingly accessing and without permission, altering, and making use of data from Plaintiffs' mobile devices in order to devise and execute business practices to deceive Plaintiffs and Class members into surrendering private electronic communications and activities for Defendants' financial gain, and to wrongfully obtain valuable private data from Plaintiffs.

311.   Defendants have violated California Penal Code § 502(c)(2) by knowingly accessing and without permission, taking, or making use of data from Plaintiffs' mobile devices.

312.   Defendants have violated California Penal Code § 502(c)(3) by knowingly and without permission, using and causing to be used Plaintiffs' mobile computing devices' services.

313.   Defendants have violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiffs' computers, computer system, and/or computer network.

314.   Defendants have violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' computer, computer system, and/or computer network.

315.   California Penal Code § 502(j) states: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

316.   Plaintiffs have also suffered irreparable injury from these unauthorized acts of disclosure, to wit: their personal, private, and sensitive electronic data was obtained and used by

1   Defendants. Due to the continuing threat of such injury, Plaintiffs have no adequate remedy at

2   law, entitling Plaintiffs to injunctive relief.

3      317.   Plaintiffs and Class members have additionally suffered loss by reason of these

4   violations, including, without limitation, violation of the right of privacy.

5      318.   As a direct and proximate result of Defendants' unlawful conduct within the

6   meaning of California Penal Code § 502, Defendants have caused loss to Plaintiffs in an amount

7   to be proven at trial. Plaintiffs are also entitled to recover their reasonable attorneys' fees

8   pursuant to California Penal Code § 502(e).

9      319.   Plaintiffs and the Class members seek compensatory damages, in an amount to

10   be proven at trial, and injunctive or other equitable relief.

**Fourth Cause of Action**
**Violation of the California Invasion of Privacy Act**
**Penal Code § 630 *et seq.***

13      320.   Plaintiffs incorporate the above allegations by reference as if set forth herein at

14   length.

15      321.   Plaintiffs assert this claim against each and every California Defendant named

16   herein in this complaint on behalf of themselves and the Class.

17      322.   California Penal Code section 630 provides, in part:

18      "Any person who, . . . or who willfully and without the consent of all parties to the

19   communication, or in any unauthorized manner, reads, or attempts to read, or to learn the

20   contents or meaning of any message, report, or communication while the same is in transit or

21   passing over any wire, line, or cable, or is being sent from, or received at any place within this

22   state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in

23   any way, any information so obtained, or who aids, agrees with, employs, or conspires with any

24   person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

25   mentioned above in this section, is punishable . . ."

26      323.   At all relevant times, Defendants business practices of accessing the mobile

27   device data of the Plaintiffs and Class Members was without authorization and consent;

28   including but not limited to obtaining any and all communications involving their UDID.

324.   On information and belief, each Plaintiff, and each Class Member, during one or more of their interactions on the Internet during the Class Period, communicated with one or more web entities based in California, or with one or more entities whose servers were located in California.

325.   Communications from the California web-based entities to Plaintiffs and Class Members were sent from California. Communications to the California web-based entities from Plaintiffs and Class Members were sent to California.

326.   Plaintiffs and Class Members did not consent to any of the Defendants' actions in intercepting, reading, and/or learning the contents of their communications with such California-based entities.

327.   Plaintiffs and Class Members did not consent to any of the Defendants' actions in using the contents of their communications with such California-based entities.

328.   Defendants are not a " public utility engaged in the business of providing communications services and facilities . . ."

329.   The actions alleged herein by the Defendants were not undertaken: "for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility."

330.   The actions alleged herein by the Defendants were not undertaken in connection with: "the use of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility.

331.   The actions alleged herein by the Defendants were not undertaken with respect to any telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

332.   The Defendants directly participated in the interception, reading, and/or learning the contents of the communications between plaintiffs, Class Members and California-based web entities.

333.   Alternatively, and of equal violation of the California Invasion of Privacy Act, the Defendants aided, agreed with, and/or conspired with Apple to unlawfully do, or permit, or cause to be done all of the acts complained of herein.

334.   Plaintiffs and Class Members have additionally suffered loss by reason of these violations, including, without limitation, violation of the right of privacy.

335.   Unless restrained and enjoined, Defendants will continue to commit such acts. Pursuant to Section 637.2 of the California Penal Code, Plaintiffs and the class have been injured by the violations of California Penal Code section 631. Wherefore, Plaintiffs, on behalf of themselves and on behalf of a similarly situated Class of consumers, seek damages and injunctive relief.

### Fifth Cause of Action
### Violation of the Consumer Legal Remedies Act
### ("CLRA") California Civil Code § 1750, *et seq.*

336.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

337.   In violation of Civil Code section 1750, et seq. (the "CLRA"), Defendant has engaged and is engaging in unfair and deceptive acts and practices in the course of transactions with Plaintiffs, and such transactions are intended to and have resulted in the sales of services to consumers. Plaintiffs and the Class Members are "consumers" as that term is used in the CLRA because they sought or acquired Defendant's good or services for personal, family, or household purposes.

338.   At all relevant times, Defendants' business practices of selling iTunes applications, or allowing iTunes application use for free, were goods Plaintiffs and Class Members obtained for use. Defendants' scheme to offer such goods misleads the nature and integrity of the iPhone application since Defendants intended to use such for mobile device tracking.

339.   Defendant's representations that its services have characteristics, uses, and benefits that they do not have, in violation of Civil Code § 1770(a)(5);

340.   In addition, Defendant's modus operandi constitutes a sharp practice in that Defendant knew, or should have known, that consumers care about the status of personal

1    information and email privacy but were unlikely to be aware of the manner in which Defendant

2    failed to fulfill its commitments to respect consumers' privacy. Defendant is therefore in

3    violation of the "unfair" prong of the UCL.

4         341.   Defendant's acts and practices were fraudulent within the meaning of the UCL

5    because they are likely to mislead the members of the public to whom they were directed.

6         342.   Plaintiffs, on behalf of themselves and on behalf of each member of the Class,

7    shall seek individual restitution, injunctive relief, and other relief allowed under the UCL as the

8    Court deems just and proper.

9         343.   This cause of action is brought pursuant to the California Consumers Legal

10   Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA"). This cause of action does not seek

11   monetary damages at this point, but is limited solely to injunctive relief. Plaintiff will amend

12   this Class Action Complaint to seek damages in accordance with the CLRA after providing the

13   Defendants with notice pursuant to California Civil Code § 1782.

14        344.   At this time, Plaintiffs seek only injunctive relief under this cause of action.

15   Pursuant to California Civil Code, Section 1782, Plaintiffs will notify Defendant in writing of

16   the particular violations of Civil Code, Section 1770 and demand that Defendant rectify the

17   problems associated with its behavior detailed above, which acts and practices are in violation

18   of Civil Code § 1770.

19        345.   If Defendant fails to respond adequately to Plaintiff's above-described demand

20   within 30 days of Plaintiff's notice, pursuant to California Civil Code, Section 1782(b),

21   Plaintiffs will amend the complaint to request damages and other relief, as permitted by Civil

22   Code, Section 1780.

### Sixth Cause of Action
### Unfair Competition
### California Business and Professions Code § 17200

23
24        346.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

25        347.   In violation of California Business and Professions Code § 17200 et seq.,

26   Defendant's conduct in this regard is ongoing and includes, but is not limited to, unfair,

27   unlawful and fraudulent conduct.

28

348.   Defendant misled consumers by continuously and falsely representing during the Class Period that they would not make personally identifiable information available to third parties as alleged herein.

349.   At all relevant times, Defendants' business practices of merging Defendant Apple's mobile devices and Defendant Application Developer's applications and services to Plaintiffs and Class Members by way of, *inter alia*, commercial marketing and advertising, misrepresented and/or omitted the truth about the extent to which Defendants would obtain and share Plaintiffs' and Class Members' sensitive and personal identifiable information with third parties.

350.   Defendants engaged in these unfair and fraudulent practices to increase their profits. Had Plaintiff know that Defendants would share his personally identifiable information with third parties; he would not have purchased or used the Defendants' services, which in turn, forced him to relinquish, for free, valuable personal information.

351.   By engaging in the above-described acts and practices, Defendant has committed one or more acts of unfair competition within the meaning of the UCL and, as a result, Plaintiffs and the Class have suffered injury-in-fact and have lost money and/or property—specifically, personal information and/or registration fees.

352.   Defendant's business acts and practices are unlawful, in part, because they violate California Business and Professions Code § 17500, et seq., which prohibits false advertising, in that they were untrue and misleading statements relating to Defendant's performance of services and with the intent to induce consumers to enter into obligations relating to such services, and regarding statements Defendant knew were false or by the exercise of reasonable care Defendant should have known to be untrue and misleading.

353.   Defendant's business acts and practices are also unlawful in that they violate the California Consumer Legal Remedies Act, California Civil Code, Sections 1647, et seq., 1750, et seq., and 3344, California Penal Code, section 502, and Title 18, United States Code, Section 1030. Defendant is therefore in violation of the "unlawful" prong of the UCL.

354.   Defendant's business acts and practices are unfair because they cause harm and injury-in-fact to Plaintiffs and Class Members and for which Defendant has no justification other than to increase, beyond what Defendant would have otherwise realized, its profit in fees from advertisers and its information assets through the acquisition of consumers' personal information. Defendant's conduct lacks reasonable and legitimate justification in that Defendant has benefited from such conduct and practices while Plaintiffs and the Class Members have been misled as to the nature and integrity of Defendant's services and have, in fact, suffered material disadvantage regarding their interests in the privacy and confidentiality of their personal information. Defendant's conduct offends public policy in California tethered to the Consumer Legal Remedies Act, the state constitutional right of privacy, and California statutes recognizing the need for consumers to obtain material information that enables them to safeguard their own privacy interests, including California Civil Code, Section 1798.80.

**Seventh Cause of Action**
**Breach of Contract**
**Against Defendant Apple**

355.   Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

356.   Plaintiffs and Class Members entered into a contract with Defendant Apple in order to use the iTunes Store apps. This contract had rights, obligations, and duties between Plaintiffs and Class Members and Defendant Apple, including but not limited to, protecting the privacy of its users.

357.   Plaintiffs and Class Members activities involved in their use of the iTunes App Store included, but was not limited to, providing personal identifying information to Defendant Apple; furthermore Defendant Apple designed the Plaintiffs and Class Members mobile device data, including but not limited to, their mobile devices' UDID with third parties, including Defendant Application Developers and Defendant Application Developers Affiliates, on violation of its own contract with Plaintiffs and Class Members.

1      358.   Plaintiffs and Class Members did not have notice, nor consent to, Defendant

2   Apple sharing their mobile devices UDID with Defendant Application Developers or Defendant

3   Application Developers Affiliates.

4      359.   Plaintiffs and Class Members have performed their obligation pursuant to

5   Defendant Apple's contract.

6      360.   Defendant Apple has materially breached its contractual obligations through its

7   conduct.

8      361.   Plaintiffs and Class Members have been damaged as a direct and proximate

9   result of Defendant Apple's breach of its contract with Plaintiffs and Class Members.

**Eighth Cause of Action**
**Breach of Contract**
**Against Defendants NPR, New York Times, Pandora Media, Yelp!, IAC/InterActiveCorp.**

12      362.   Plaintiff hereby incorporates by reference the allegations contained in all of the

13   preceding paragraphs of this complaint.

14      363.   Plaintiffs and Class Members entered into a contract with one (1) or more of the

15   following Application Developers: NPR, New York Times, Pandora Media, and Yelp!,

16   IAC/InterActiveCorp, Inc., hereinafter referred to collectively as Application Developers. This

17   contract had rights, obligations, and duties between Plaintiffs and Class Members and

18   Defendant Application Developers, including but not limited to, protecting the privacy of its

19   users.

**Ninth Cause of Action**
**Conversion**

21      364.   Plaintiff hereby incorporates by reference the allegations contained in all of the

22   preceding paragraphs of this complaint.

23      365.   Plaintiffs and Class Members mobile device data, including but not limited to

24   their mobile devices' UDID is being used by Defendants to obtain sensitive and personal

25   identifying information derived from Plaintiffs' and Class Members' mobile browsing activities.

26   Such property, owned by the Plaintiffs and Class Members, as valuable to the Plaintiffs and

27   Class Members.

366. Plaintiffs and Class Members mobile devices use bandwidth. Defendants' activities, made the basis of this action, used without notice or authorization, such bandwidth for purposes not contemplated, not agreed to, by Plaintiffs and Class Members when they downloaded Defendant Application Developer's applications. Such property, owned by the Plaintiffs and Class Members, is valuable to the Plaintiffs and Class Members.

367. Defendants unlawfully exercised dominion o said property and thereby converted Plaintiffs' and Class Members' property, by providing sensitive and personal identifying information to third parties and by using Plaintiffs' and Class Members' bandwidth for data mining, in violation of the collective Class Allegations, made the basis of this action.

368. Plaintiffs and Class Members were damaged thereby.

### Tenth Cause of Action
### Trespass to Personal Property / Chattels

369. Plaintiffs incorporate by reference all paragraphs previously alleged herein.

370. The common law prohibits the intentional intermeddling with personal property, including a mobile device, in possession of another which results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

371. By engaging in the acts alleged in this complaint without the authorization or consent of Plaintiffs and Class Members, Defendants dispossessed Plaintiffs and Class Members from use and/or access to their mobile devices, or parts of them. Further, these acts impaired the use, value, and quality of Plaintiffs' and Class Members' mobile device. Defendants' acts constituted an intentional interference with the use and enjoyment of their mobile devices. By the acts described above, Defendants has repeatedly and persistently engaged in trespass to personal property in violation of the common law.

372. Without Plaintiffs' and Class Members' consent, or in excess of any consent given, Defendants knowingly and intentionally accessed Plaintiffs' and Class Members' property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the property and causing injury to Plaintiffs and the members of the Class.

1    373.   Defendants engaged in deception and concealment in order to gain access to

2    Plaintiffs' and Class Members' mobile devices.

3    374.   Defendants undertook the following actions with respect to Plaintiffs' and Class

4    Members' mobile devices:

5          a) Defendants accessed and obtained control over the user's mobile device;

6          b) Defendants obtained user's UDID from a tracking code the user's mobile

7             device;

8          c) Defendants used the user's UDID to obtain without notice or consent, mobile

9             browsing activities of the mobile device, and outside of the control of the

10            owner of the mobile device.

11   375.   All these acts described above were acts in excess of any authority any user

12   granted when he or she visited the Defendant Apple's iTunes Store and downloaded one (1) or

13   more of the Defendant application and none of these acts was in furtherance of users viewing the

14   Defendant applications. By engaging in deception and misrepresentation, whatever authority or

15   permission Plaintiffs and Class Members may have granted to Defendant Apple and/or

16   Defendant Application Developers was visited.

17   376.   Defendants' installation and operation of its program used, interfered, and/or

18   intermeddled with Plaintiffs' and Class Members' mobile devices. Such use, interference and/or

19   intermeddling was without Class Members' consent or, in the alternative, in excess of Plaintiffs'

20   and Class Members' consent.

21   377.   Defendants' installation and operation of its program constitutes trespass,

22   nuisance, and an interference with Class Members' chattels, to wit, their mobile devices.

23   378.   Defendants' installation and operation of its program impaired the condition and

24   value of Class Members' mobile devices.

25   379.   Defendants' trespass to chattels, nuisance, and interference caused real and

26   substantial damage to Plaintiffs and Class Members.

27   380.   As a direct and proximate result of Defendants' trespass to chattels, nuisance,

28   interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members'

property, Defendants has injured and impaired in the condition and value of Class Members'

mobile devices, as follows:

    a) By consuming the resources of and/or degrading the performance of Plaintiffs' and Class Members' mobile devices (including space, memory, processing cycles, Internet connectivity, and unauthorized use of their bandwidth);

    b) By diminishing the use of, value, speed, capacity, and/or capabilities of Plaintiffs' and Class Members' mobile devices;

    c) By devaluing, interfering with, and/or diminishing Plaintiffs' and Class Members' possessory interest in their mobile devices;

    d) By altering and controlling the functioning of Plaintiffs' and Class Members' mobile devices;

    e) By infringing on Plaintiffs' and Class Members' right to exclude others from their mobile devices;

    f) By infringing on Plaintiffs' and Class Members' right to determine, as owners of/or their mobile devices, which programs should be installed and operating on their mobile devices;

    g) By compromising the integrity, security, and ownership of Class Members' mobile devices; and

    h) By forcing Plaintiffs and Class Members to expend money, time, and resources in order to remove the program installed on their mobile devices without notice or consent.

## Eleventh Cause of Action
## Unjust Enrichment

381.   Plaintiff hereby incorporates by reference the allegations contained in all of the paragraphs of this complaint.

382.   By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from the Plaintiff under circumstances that make it inequitable and unjust for Defendants to retain them.

383.   Defendants have received a benefit from Plaintiff and Defendants have received and retain money from advertisers and other third-parties as a result of sharing the personal information of Defendants' users' with those advertisers without Plaintiffs' knowledge or consent as alleged in this Complaint.

384.   Plaintiff did not expect that Defendants would seek to gain commercial advantage from third-parties by using his personal information without his consent.

1       385.   Defendants knowingly used Plaintiffs' personal information without his

2 knowledge or consent to gain commercial advantage from third-parties and had full knowledge

3 of the benefits they have received from Plaintiff. If Plaintiff had known Defendants were not

4 keeping his personal information from third-parties, he would not have consented and

5 Defendants would not have gained commercial advantage from third-parties.

6       386.   Defendants will be unjustly enriched if Defendants are permitted to retain the

7 money paid to them by third-parties, or resulting from the commercial advantage they gained, in

8 exchange for Plaintiffs' personal information.

9       387.   Defendants should be required to provide restitution of all money obtained from

10 their unlawful conduct.

11       388.   Plaintiff and the Members of the Class are entitled to an award of compensatory

12 and punitive damages in an amount to be determined at trial or to be imposition of a constructive

13 trust upon the wrongful revenues and/or profits obtained by and benefits conferred upon

14 Defendants as a result of the wrongful actions as alleged in this complaint.

15       389.   Plaintiff and the Class have no remedy at law to prevent Defendants from

16 continuing the inequitable conduct alleged in this complaint and the continued unjust retention of

17 the money Defendants received from third-party advertisers.

18                         **PRAYER FOR RELIEF**

19       WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays

20 for judgment against Defendants as follows:

21     A.   Certify this case as a Class action on behalf of the Classes defined above, appoint
22            Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

23     B.   Declare that the actions of Defendants, as set out above, violate the following:

24       a)   Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

25       b)   Electronic Communications Privacy Act 18 U.S.C. § 2510;

      c)   California's Computer Crime Law, Penal Code § 502;

26       d)   California Invasion of Privacy Act, Penal Code § 630;

27       e)   Consumer Legal Remedies Act, ("CLRA") California Civil Code § 1750;

28

1        f)   Unfair Competition, California Business and Professions Code § 17200;

2        g)   Breach of Contract;

3        h)   Conversion;

4        i)   Trespass to Personal Property / Chattels; and

5        j)   Unjust Enrichment

6    C.   As applicable to the Classes *mutatis mutandis*, awarding injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) requiring Defendants to delete all data surreptitiously or otherwise collected through the acts alleged above; (iv) requiring Defendants to provide Plaintiffs and the other Class Members a means to easily and permanently decline any participation in any data collection activities; (v) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and (vi) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

7

8

9

10

11

12

13    D.   Award damages, including statutory damages where applicable, to Plaintiffs and Class Members in an amount to be determined at trial;

14

15    E.   Award restitution against Defendants for all money to which Plaintiffs and the Classes are entitled in equity;

16    F.   Restrain Defendants, their officers, agents, servants, employees, and attorneys, and those in active concert or participation with them from continued access, collection, and transmission of Plaintiffs' and Class Members' personal information via preliminary and permanent injunction;

17

18

19    G.   Award Plaintiffs and the Classes:

20        a)   their reasonable litigation expenses and attorneys' fees;

21        b)   pre- and post-judgment interest, to the extent allowable;

22        c)   restitution, disgorgement and/or other equitable relief as the Court deems proper;

23        d)   compensatory damages sustained by Plaintiffs and all others similarly situated as a result of Defendants' unlawful acts and conduct;

24

25        e)   statutory damages, including punitive damages;

26        f)   permanent injunction prohibiting Defendants from engaging in the conduct and practices complained of herein;

27    H.   For such other and further relief as this Court may deem just and proper.

28

1

## JURY TRIAL DEMAND

2

3        The Plaintiffs hereby demand a trial by jury of all issues so triable.

4   Dated this 15th day of February 2011

5

                                    By:      Michael McShane
6

7                                            Audet & Partners, LLP
                                             Michael McShane
                                             Jonas P. Mann
8                                            221 Main Street
                                             Suite 1460
9                                            San Francisco, CA 94105
                                             Telephone: (415) 568-2555
10

11                                           Lockridge Grindal Nauen P.L.L.P.
                                             Richard Lockridge
                                             Robert Shelquist
12                                           Suite 2200
                                             100 Washington Avenue South
13                                           Minneapolis, Minnesota 55401
                                             Telephone: (612) 339-6900
14

15                                           Law Office of Joseph H. Malley
                                             Joseph H. Malley
                                             1045 North Zang Blvd
16                                           Dallas, TX 75208
                                             Telephone: (214) 943-6100
17

18

19

20

21

22

23

24

25

26

27

28